Filed 10/16/14  In re K.G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K. G., a Person Coming Under the Juvenile Court Law. | |
| | B252758 c/w B253595 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK89770) |
| Plaintiff and Respondent, | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| v. | |
| ROOSEVELT W. et al., | |
| Defendants and Appellants. | |

THE COURT:*

It is ordered that the opinion filed October 14, 2014, be modified as follows:

page 1, remove "Marilyn Martinez, Commissioner" and replace with "Carlos E. Vasquez, Judge";

page 1, line beginning with William Hook, place "Roosevelt W." after "for Defendant and Appellant."

_____

page 1, add line "Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant Kanika G."

There is no change in the judgment.

_____
*EPSTEIN, P. J.          MANELLA, J.          WILLHITE, J.

Filed 10/14/14 (unmodified version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K. G., a Person Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | B252758 c/w B253595 (Los Angeles County Super. Ct. No. CK89770) |
| Plaintiff and Respondent, | |
| v. | |
| ROOSEVELT W. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marilyn Martinez, Commissioner.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

Appellants Roosevelt W. (Father) and Ka. G. (Mother) are the parents of Kingston W., a young boy, and K.G., "Ky," an infant girl. In a prior writ proceeding initiated by Father, we reviewed the juvenile court's November 4, 2013 order as it related to Kingston and in a March 24, 2014 opinion denied the writ.[1] In this appeal, both parents seek review of the November 4, 2013 order as it relates to Ky. They contend the court erred in (1) refusing Father's request for placement of Ky under Welfare and Institutions Code section 361.2; (2) requiring Father to participate in reunification services; (3) refusing Mother's request that Ky be returned to her custody; (4) finding that reasonable reunification services had been provided to Mother; and (5) restricting their contact with Ky to monitored visits.[2] For the reasons discussed, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Prior Proceeding*

The family came to the attention of the Department of Children and Family Services (DCFS) in September 2011, almost a year prior to Ky's birth. Mother, then living with her parents and Kingston, had a mental breakdown. After being released from a psychiatric hold, she fled with her son to Alabama, where Father lived. Father contacted DCFS and arranged for the boy to be returned to California, to reside with his maternal grandparents, who were eventually given custody by the juvenile court. At a jurisdictional hearing in November 2011, the court found that Mother had mental and emotional problems that rendered her

---

[1] The order terminated reunification services for both parents with respect to Kingston and set a hearing to consider termination of parental rights.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

2

incapable of providing regular care for the boy.[3]  Mother's reunification plan with respect to Kingston required her to undergo a psychiatric evaluation, to participate in counseling, and to take all prescribed psychotropic medication.

Father was initially deemed non-offending and was not ordered to participate in services.  After the jurisdictional hearing, Mother reported that Father had physically abused her, and DCFS filed a section 342 subsequent petition.[4]  At a second jurisdictional hearing held in July 2012, the court sustained allegations that Mother and Father had a history of engaging in violent altercations, specifically finding true that Father had struck Mother with a rope, tied her to a chair, and slapped her, and that Mother had thrown boiling water at Father.  Father's reunification plan, also addressed at the July 2012 hearing, required him to take a parenting class and to undergo individual counseling to address domestic violence and other case issues with a DCFS-approved counselor.

B.  *Jurisdictional and Dispositional Hearings for Ky*

Ky was born in August 2012, testing positive for marijuana.  Mother was disoriented and anxious after the birth, and did not want medical personnel to touch the baby or to perform standard tests.  DCFS filed a petition under section 300 seeking to assert jurisdiction under section 300, subdivision (b) (failure to protect) and subdivision (j) (abuse of sibling).  Ky was detained and placed with Kingston in the home of their maternal grandparents.

At the September 2012 jurisdictional hearing for Ky, Mother acceded to the following findings:  (1) in support of jurisdiction under subdivision (b) of section

---

[3]      The evidence indicated that Mother claimed, among other things, that she was God, that God was talking to her, and that the police officers and medical personnel who came to evaluate her were devils.  Father reported that while in Alabama, Mother left the house naked and threw knives at him.

[4]      Father admitted tying Mother to a chair, slapping her, hitting her legs with a rope and forcing her to take medication.

3

300, the finding that Mother had used marijuana during her pregnancy and that she displayed mental and emotional problems rendering her incapable of providing regular care for the child and endangering the child's physical and emotional health and safety; and (2) in support of jurisdiction under subdivision (j) of section 300, the finding that Mother had inappropriately physically disciplined Kingston by striking him with a belt, and that Mother and Father had engaged in violent altercations in front of Kingston, as described above. At the dispositional phase of the hearing, Mother was instructed to participate in individual counseling with a DCFS-approved counselor, to take all prescribed psychotropic medications, to participate in six random drug tests, and to participate in a drug rehabilitation program if any test was missed or dirty.

Prior to the original jurisdictional/dispositional hearing for Ky, Mother had identified another man as Ky's father. In April 2013, the court found that Father was Ky's presumed father and instructed DCFS to initiate an ICPC (Interstate Compact on the Placement of Children) evaluation of Father's home in Alabama.[5] In May 2013, the caseworker reported receiving a letter from Father's Alabama therapist indicating he had been under her care for less than a month.[6] DCFS concluded Father's counseling had been inadequate and recommended termination of reunification services with respect to Kingston. In July and August, DCFS continued to recommend in its court-filed reports termination of Father's reunification services with respect to Kingston because Father had not participated in therapy beyond the four weeks completed in 2012. Father maintained that the

---

[5]     Alabama's Department of Human Resources was unable to complete the requested home study because Father appeared to have moved to California and was not available to be interviewed in Alabama. Father subsequently explained that he had remained in this state to care for an ailing parent, but maintained an address in Alabama.

[6]     At the 12-month review hearing for Kingston in January 2013, Father had testified that he had attended counseling sessions with a therapist in Alabama twice weekly for a brief period, but that he did not discuss with the therapist all the incidents of domestic violence found true by the court, and that he did not believe tying Mother to a chair constituted domestic violence.

4

counseling he had received was sufficient. Pending its determination of this issue, the court postponed ordering a new reunification plan for Father in Ky's proceeding.

C. *Mother's Progress*

Mother's participation in the reunification plan ordered at Kingston's dispositional hearing had vacillated wildly. After her return from Alabama, she submitted to an intake assessment at a mental health clinic and began attending an anger management group, parenting classes, and group counseling for people suffering from schizophrenia. She was evaluated by a psychiatrist in April 2012, who diagnosed a psychotic disorder, but prescribed no medication because Mother was pregnant with Ky and was unwilling to take medication. Subsequently, Mother claimed she had no need to participate in counseling or change any of her behavior, and cut off all contact with the caseworker.

After Ky's birth, Mother enrolled in Narconon, where she participated for nearly a year in parenting and life skills classes, a drug education and relapse prevention program, a domestic violence/anger management program, and individual counseling. For a time, she attended classes six hours per day, Monday through Friday. Drug tests administered by the program were consistently negative. In January 2013, she obtained a letter from the Los Angeles County Department of Mental Health indicating she did not have a mental condition requiring psychotropic medication.

Mother's visitation with Ky was initially appropriate and pleasant. Beginning in October 2012, however, Mother began refusing to bottle feed Ky during the visits, insisting she should be breastfed. During a period of several months, Mother regularly engaged in inappropriate discussions with Kingston about the case, and argued with the caseworker and her parents in front of the

5

children.  On separate occasions in October 2012, she told Kingston that his grandparents were "devil worshippers" and that his grandmother was "Satan."  On another occasion, after the caseworker terminated the visit because Mother started yelling, Mother refused to relinquish the children until law enforcement personnel arrived, frightening Kingston.  On that occasion, she attempted to force her breast into Ky's mouth, causing the baby to cry.  In the latter part of 2012, Mother threatened the caseworker.  She also threatened to spank Kingston during a visit and told him he would never see his grandparents again after she regained custody.  By May 2013, Mother appeared to be making progress and began once again to behave appropriately during visitation.  However, she refused to communicate with her parents, even when they attempted to impart important medical and developmental information concerning Ky.[7]

In May 2013, DCFS recommended six more months of services for Mother, and proposed that Mother obtain another psychiatric evaluation.  Shortly after that report was filed, the caseworker learned that Mother had been discharged from Narconon for missing classes, yelling and screaming at her counselor, and exhibiting hostility toward staff members.  In its July and August 2013 status reports, DCFS recommended termination of Mother's reunification services.  During this period, Mother was not participating in any program and had refused to undergo another psychiatric evaluation.

D. *November 4, 2013 Review Hearing*

At the hearing on November 4, 2013, which was the six-month review hearing for Ky and the 18-month review hearing for Kingston, the court found that reasonable services had been provided, but that the parents had not regularly

---

[7] Ky suffered from torticollis, which caused her neck to incline to one side.  She also suffered a cranial deformation, requiring her to wear a helmet.  In addition, she was receiving therapy for developmental issues.

contacted and visited with Kingston and had not made significant progress in resolving the problems that led to Kingston's removal from the home or demonstrated the capacity and ability to complete the objectives of the treatment plan or to provide for the boy's safety, protection, physical and emotional well being, and special needs. With respect to Father's claim that he had complied with the reunification plan by participating in therapy in Alabama for four weeks, the court found that Father had made only partial progress toward alleviating or mitigating the causes necessitating the assertion of jurisdiction, and specifically found that one month in therapy could not address the violent conduct asserted in the petition, "given the seriousness of the domestic violence allegations . . . ."[8] The court terminated reunification services with respect to Kingston, and set a section 366.26 hearing.

At that same hearing, the court initiated a reunification plan for Father with respect to Ky. The court ordered Father to participate in a parenting program and individual counseling to address domestic violence, as well as obtain medical training to address Ky's medical needs. Father's counsel requested a home of parent order for Ky, based on the same evidence that had been submitted to establish that Father had complied with the dispositional plan with respect to Kingston. The request was denied.

The court also addressed Mother's progress with respect to Ky. Although the court-filed reports recommended terminating Mother's reunification services, its counsel stated that DCFS was not opposed to extending services for an additional six months, as long as services included individual counseling with a

---

[8]     In our prior opinion, we affirmed the order terminating Father's reunification services with respect to Kingston. We found that Father was aware by the 18-month review hearing that neither DCFS nor the court considered the four weeks of counseling he received nearly enough to address the proclivity for domestic violence demonstrated by the allegations of the petition, and that no different result would have obtained had his request for a contested hearing been granted.

7

licensed therapist and medical training.[9] Mother's counsel was asked to comment, and voiced no objection, but stated that Mother was in need of therapist referrals. The court found that reasonable services had been provided. It found that Mother had made partial progress towards alleviating or mitigating the causes necessitating placement of Ky and that she had regularly and consistently visited the child, but that return of the child to Mother would create a substantial risk of detriment to the physical or emotional well-being of the child. It ordered Mother to undergo therapy with a licensed therapist and to enroll in medical training to address Ky's medical needs. The court instructed DCFS to provide Mother referrals for individual counseling.

With respect to visitation, the court gave DCFS discretion to liberalize, but ordered that visitation remain monitored until DCFS exercised that discretion. The court's order further stated that Father could have unmonitored visits at the recommendation of his DCFS-approved therapist, once he commenced therapy with a therapist. Mother and Father appealed.

## DISCUSSION

### A. *Father's Appeal*

#### 1. *Ky's Placement*

Section 361.2, subdivision (a) requires that when a court orders the removal of a child from a custodial parent after asserting jurisdiction under section 300, it shall "determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." If such parent requests custody, "the court shall place the child with the parent

___

[9] DCFS also sought to examine an infant to whom Mother had given birth shortly before the hearing. That infant is not a subject of this appeal.

8

unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Father contends on appeal that the trial court erred in refusing his request for placement at the November 4, 2013 hearing. He argues that section 361.2 required the court to place Ky with him at that time. Respondent contends that section 361.2 can be invoked only at the original detention hearing, when the child is first removed from the custodial parent's home, and that Father's request came too late.

We need not resolve this issue.[10] As our Supreme Court has said, "even if section 361.2 did apply at [a later] stage of the proceedings, the statute assumes the existence of a competent parent able to immediately assume custody." (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 454.) Father's claim that he was entitled to custody of Ky under section 361.2 is based on the proposition that he had "successfully participated in services in Kingston's case that resolved all his issues." That claim is not born out. At jurisdictional hearings in July and September 2012, the court found that Father had repeatedly engaged in serious domestic violence. The court found at the November 4, 2013 hearing that Father had not made substantial progress in resolving the problems that led to Kingston's removal from the home, and that he had not demonstrated the capacity and ability to complete the objectives of the treatment plan and provide for the boy's safety, protection, physical and emotional well being. It specifically found that the four weeks of therapy he had undergone in Alabama were insufficient to address the serious domestic violence allegations of the petition. We upheld that finding on

---

[10] We note that although the Supreme Court stated in *In re Zacharia D*. (1993) 6 Cal.4th 435, 453, that the language of the provision "suggests that the statute is applicable only at the time the child is first removed from the custodial parent or guardian's home," several recent Court of Appeal decisions have held that its provisions can be invoked if a nonoffending noncustodial parent appears at a later hearing. (See, e.g., *In re Jonathan P*. (2014) 226 Cal.App.4th 1240, 1253-1257; *In re Suhey G*. (2013) 221 Cal.App.4th 732, 743; *In re Janee W*. (2006) 140 Cal.App.4th 1444, 1451.) Moreover, several of the California Rules of Court governing dependency proceedings state that the juvenile court must follow or apply the procedures of section 361.2 at review hearings. (See, e.g., Cal. Rules of Court, rule 5.710(b)(2) & rule 5.708(k).)

appeal. Having previously rejected Father's argument, we conclude the court did not err in refusing to grant him custody of Ky.[11]

## 2. *Disposition*

In a similar vein, Father contends the court's dispositional order requiring him to participate in reunification services in order to gain custody of Ky was unwarranted as he had "already successfully completed [the ordered services] in Kingston's case." The court's order in the proceeding relating to Kingston, which we previously affirmed, established that Father was in need of additional services to address the domestic violence that led to assertion of jurisdiction over both Kingston and Ky. In acknowledgment of Father's efforts, the court did not require Father to re-take a parenting class or re-enroll in an anger management program. It required only that he augment the therapy found to be inadequate by both DCFS and the court by participating in additional counseling with a DCFS-approved therapist. "'The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion.'" (*In re Corrine W.* (2009) 45 Cal.4th 522, 532, quoting *In re Jose M*. (1988) 206 Cal.App.3d 1098, 1103-1104.) We perceive no abuse of discretion in the court's dispositional order requiring Father to participate in further counseling to address his proclivity for domestic violence.

---

[11] At the time Father's opening brief was filed, our opinion in the prior related proceeding had not yet issued.

10

B. *Mother's Appeal*

      1. *Return of Ky*

At the six-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) Mother contends that the court's finding at the November 4, 2013 hearing that returning Ky to her custody posed a risk of detriment was not supported by substantial evidence. We disagree.

"The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs" constitutes "prima facie evidence that return would be detrimental." (§ 366.21, subd. (e).) In determining whether return would be detrimental, the court "shall consider the efforts or progress . . . demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself to services provided . . . ." (*Ibid.*) Here, jurisdiction was asserted in large part because Mother's mental and emotional problems rendered her incapable of providing regular care for her children. Mother continued to exhibit troubling behavior during the pendency of the proceedings below. She threatened the caseworker. She threatened to physically punish Kingston. She argued loudly and inappropriately with the caseworker and the grandparents in front of the children. She referred to the grandparents during visitations as "devil worshippers" and "Satan." She refused to communicate with them, even about Ky's medical condition and needs. On one occasion, she refused to relinquish the children until forced to do so by law enforcement personnel. At the time of the November 4, 2013 hearing, Mother was not participating in any services. The record reflects that Mother had been dismissed from her prior

11

program in May 2013 for missing classes, yelling and screaming at her counselor, and exhibiting hostility toward staff members. Under these circumstances, the court reasonably concluded that Mother had not made sufficient progress in resolving the problems that led to the children's removal from her home, and that return of Ky to Mother would create a substantial risk of detriment.

### 2. *Reasonableness of Services*

If the child is not returned to the parent or legal guardian at the six-month review hearing, "the court shall determine whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent or legal guardian. The court shall order that those services be initiated, continued, or terminated." (§ 366.21, subd. (e).) Mother contends that the court failed to make such finding with respect to Ky and that in any event, substantial evidence would not have supported it.

As respondent points out, the court's November 4, 2013 minute order includes a finding that reasonable services were provided, although the court did not make the finding on the record. Mother claims that services were not reasonable, but does not point to any specific deficiency other than an alleged failure to provide services to address her failure to communicate with the grandparents, which was not a basis for assertion of jurisdiction.[12] The record reflects that Mother was enrolled for nearly a year in a program to help her resolve the issues that led to the assertion of jurisdiction over the children, but that she was

---

[12] A new caseworker had been assigned in early 2013 after Mother threatened the previous caseworker. The new caseworker suffered a stroke, and was on medical leave for several weeks in the summer of 2013, causing several reports to be filed late and the postponement of Ky's six-month review hearing. In her brief, Mother discusses these facts in connection with her claim that the services provided were not reasonable, but does not specify any way in which the caseworker's medical problems and occasional absences interfered with Mother's ability to comply with the reunification plan.

discharged as a result of her own inappropriate behavior.  There is no evidence in the record that she thereafter attempted to obtain referrals for a new program from DCFS.  To the contrary, it appears that, like Father, she took the position that she had resolved all of her issues and required no additional services.  Once a parent is informed of the proceedings and the requirements of the court-ordered plan, "it became the obligation of the parent to communicate with the Department and participate in the reunification process."  (*In re Raymond R*. (1994) 26 Cal.App.4th 436, 441.)  The agency is not required to "'take the parent by the hand and escort him or her to and through classes or counseling sessions.'"  (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414.)  Moreover, even were we to find that the services provided prior to November 4, 2013 were inadequate, the remedy is to return the matter with instructions to the juvenile court to order additional services.  (See, e.g., *In re Taylor J*. (2014) 223 Cal.App.4th 1446, 1453; *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346-1348.)  Here, Mother was provided an additional six-months of reunification services by the court.  Accordingly, her claim that inadequate services were provided prior to November 4, 2013, even if true, provides no basis for reversal of the court's order.

### C. *Monitored Visitation*

Both Mother and Father contend that the court abused its discretion in requiring their visitation with Ky to be monitored.  For the reasons discussed, we disagree.

"There is no question but that the power to regulate visitation between minors determined to be dependent children [citation] and their parents rests in the judiciary."  (*In re Jennifer G*. (1990) 221 Cal.App.3d 752, 756.)  Defining the boundaries of the parent's visitation "necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child."  (*Id*. at 757.)

"In balancing these interests, . . . [t]he court may, of course, impose any . . . conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*Ibid.*) "[D]ependency law affords the juvenile court great discretion in deciding issues relating to parent-child visitation, which discretion we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason. [Citation.]" (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557-1558.)

Support for an order restricting a parent's visitation does not require proof of actual harm to the child by the parent; the standard is substantial risk or danger of harm. (See *In re Marriage of Birdsall* (1988) 197 Cal.App.3d 1024, 1030; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1656-1658.) In determining the need for such an order, "the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; see also *In re Y.G.* (2009) 175 Cal.App.4th 109, 116 [juvenile court may "consider a broad class of relevant evidence in deciding whether a child is at substantial risk from a parent's failure or inability to adequately protect or supervise the child."].)

The evidence in the record supports that Mother had difficulty maintaining appropriate standards of behavior during visitation. Even when monitored, she engaged in inappropriate discussions with Kingston about the case, threatened to physically discipline him, argued with the caseworker and her parents, and on one occasion, refused to relinquish custody of the children. After initially making progress in the Narconon program, she was abruptly discharged in May 2013 due to her inability to control her outbursts, and had not begun any other programs or therapy at the time of the November 4, 2013 hearing. Although Father's abusive behavior was directed at Mother, courts have recognized that "'children of abusive fathers are likely to be physically abused themselves.'" (*In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562, quoting Cahn, Civil Images of Battered Women: The

14

Impact of Domestic Violence on Child Custody Decisions (1991) 44 Vand. L.Rev. 1041, 1055-1056; accord, *In re E.B.* (2010) 184 Cal.App.4th 568, 576.)  Moreover, should Mother and Father resume their relationship, which they have never abandoned, continuing domestic violence could endanger an infant unable to protect herself.  We conclude the court did not abuse its discretion in requiring monitored visitation.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P.J.


WILLHITE, J.

16