Filed 11/21/13

## *CERTIFIED FOR PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re SUHEY G., A Person Coming Under the Juvenile Court Law. | B247969 |
| ESTEBAN G., | (Los Angeles County Super. Ct. No. CK92510) |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Debra L. Losnick, Juvenile Court Referee. (Pursuant to Cal. Const., art. VI, § 21.) Petition denied in part and granted in part, with directions.

Los Angeles Dependency Lawyers, Inc., Law Office of Marlene Furth, Danielle Butler Vappie and Diane Nicola, for Petitioner, Esteban G.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Real Party in Interest.

*INTRODUCTION*

By petition for an extraordinary writ, Esteban G. (father) asks us to vacate the trial court's order (1) for an evaluation of him under the Interstate Compact on the Placement of Children (ICPC) and (2) setting a selection and implementation hearing pursuant to Welfare and Institutions Code[1] section 366.26[2] as to his daughter, five-year-old Suhey G. (Suhey). Father contends that the court abused its discretion in ordering an ICPC evaluation because the ICPC does not apply to out-of-state placements with a parent. Father further contends that the court erred in setting a section 366.26 hearing without requiring the Department of Children and Family Services (Department) to show that placement of Suhey with father would be detrimental to her under section 361.2.[3]

We issued a stay of the section 366.26 hearing and an order to show cause and the Department responded. We have reviewed the petition on the merits and conclude that the court erred to the extent it set a section 366.26 hearing and denied father a fair opportunity to present his case for relief under section 361.2.[4] The petition, however,

---

[1]    Unless otherwise stated, all statutory references are to the Welfare and Institutions Code.

[2]    Section 366.26 governs the termination of parental rights of children adjudged dependents of the court.

[3]    Section 361.2 governs placement of a child with a noncustodial parent when the child is initially removed from parental custody.

[4]    As we discuss below, subsequent events have substantially altered the posture of this case. The Department, therefore, argues that father's petition has become moot. We disagree, but, in any event, the importance of the issues raised in this matter and the

will be denied as to father's objection to the trial court's order for an ICPC evaluation on the ground that the trial court did not abuse its discretion in ordering such an evaluation.

### FACTUAL AND PROCEDURAL BACKGROUND[5]

On March 12, 2012, the Department filed a petition alleging, among other things, that (1) Suhey had been physically abused by mother, Brenda L. (mother), (2) mother abused methamphetamine, and (3) Suhey and her infant brother[6] had been exposed to violent conduct between mother and mother's male companion. Although the Department possessed county records indicating that father's last known address was in the state of Idaho, the Department served father with notice of the detention hearing at his last known street address in "Idaho, California."[7] At the detention hearing, the Department reported that father's "whereabouts were unknown." The court found that father was Suhey's presumed father and ordered the Department to present evidence of due diligence in its attempts to locate father. The children were ordered detained and

---

likelihood of their reoccurrence, justifies the exercise of our discretion to retain jurisdiction in order to consider and resolve those issues. (*Environmental Charter High School v. Centinela Valley Union High School District* (2004) 122 Cal.App.4th 139, 144; *City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121 at fn. 5.)

[5]  Our discussion of the chronological factual context in which this case arose is very detailed but is important to our consideration and resolution of the issues presented.

[6]  Suhey's brother is not related to father and is not a subject of this writ proceeding.

[7]  We take judicial notice of the fact that there is no city of "Idaho" in California. (Evid. Code, § 452, subds. (g) and (h).)

were placed in the home of maternal aunt.  The Department was ordered to provide mother with family reunification services.

The Department attempted to serve father with notice of the jurisdiction/disposition hearing at the "Idaho, California" address once again.  The record shows that the notice was returned to the Department as "not deliverable as addressed."  At the hearing on April 23, 2012, the court sustained the petition's allegations under section 300, subdivisions (a) and (b).[8]  The Department filed a declaration documenting its efforts to locate father and stating that his whereabouts remained unknown.[9]  At the hearing, mother was ordered to participate in counseling and random drug testing, and was allowed monitored visits with Suhey.  The court further ordered that mother be provided with reunification services but denied

---

[8]    Section 300, subdivision (a) provides that a child comes within the jurisdiction of the juvenile court when the child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parents.  Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of the parent's failure to adequately supervise or protect the child.

[9]    In a "Declaration of Due Diligence," the Department listed its attempts to locate father which included searching records of "Lexis Nexis," the "California Child Support Automation System," the "Federal Bureau of Prisons," "WCMIS," "CWS/CMS," Los Angeles County central booking, "Global Locate," the California DMV, the Idaho Department of Corrections, the Ada County Jail in Idaho, the "Election Information System," and "CYA."  The Department also did a "Postal Record Search" at father's last known address in Idaho, and "telephoned" the "California Prison/Parole Locater," the "Los Angeles County Registrar Recorder of Voter Records," and the "Los Angeles County Probation Dept."

4

reunification services to father pursuant to section 361.5, subdivision (b)(1) on the grounds that his whereabouts were unknown.[10]

In a report prepared for the six-month review hearing, the Department stated that mother was not fully compliant with her drug treatment program, had failed to appear for the majority of her drug tests, and had often missed scheduled visits with the children. The Department recommended terminating mother's reunification services. On October 22, 2012, the court set the matter for a contested six-month review hearing on January 8, 2013. The only attempt to again serve father was the mailing of a notice to the same address in "Idaho, California."[11]

On December 5, 2012, father contacted the Department and stated that he wanted custody of Suhey. Maternal relatives had informed him about the proceedings.[12] Father said that he had lived with mother for the first year of Suhey's life. After he and mother separated, he tried to get visitation with Suhey but mother would not cooperate. He said that mother had "kept Suhey away from" him for the past two to three years. Maternal aunt also said that mother had threatened to report father to immigration services for being in the U.S. without documentation if he tried to obtain custody of Suhey. Suhey

[10]     Section 361.5, subdivision (b)(1) provides that "[r]eunification services need not be provided to a parent . . . when the court finds, by *clear and convincing evidence* . . . [t]hat the whereabouts of the parent . . . is unknown." (Italics added.)

[11]     The record does not indicate whether this notice was returned by the postal service.

[12]     The Department's documented efforts to locate father had *not* included asking maternal relatives about his location.

5

said that she remembered father and that she would like to visit with him. Father started talking with Suhey by phone several times a week.[13]

On December 21, 2012, the Department received a child abuse referral from a mandated reporter[14] who expressed "concern" about a "bluish purple" bruise three inches in diameter around Suhey's left ear. The reporter also stated that Suhey said she was afraid to go home. The Department investigated the referral. When asked about the bruising, Suhey said "she could have fallen on the play ground at school," then "immediately corrected herself and said that she was running at school [,] [and] [s]he ran into an object and hit the side of her face against a pole at school." Suhey said she was not hit or spanked by maternal aunt.

Maternal aunt said that Suhey must have been injured at school, and denied hitting or spanking Suhey or her own children. When one of Suhey's cousins was asked about the bruising on Suhey's face, she said " 'I don't know who did it.' " The other two cousins said that they did not know how Suhey received the bruise. The Department noted that several school personnel expressed concerns about Suhey, but concluded that "the allegation of physical abuse of Suhey [] by an unidentified perpetrator was determined to be inconclusive."

---

[13]    The record also indicates that father now pays child support for Suhey.

[14]    The Child Abuse and Neglect Reporting Act requires that specified persons called "mandated reporters" report suspected child abuse or neglect to local authorities. (Penal Code, § 11166.) The Penal Code lists 37 mandated reporters, including teachers, peace officers, firefighters, and physicians. (Penal Code, § 11165.7, subds. (a)(1)-(a)(37).) As we discuss below, this was the first of *five* such reports.

6

On January 8, 2013, the Department filed an Interim Review Report with the trial court stating that Suhey seemed "happy and comfortable in the home of the current caregivers." The report did not inform the court about the child abuse referral. Father appeared at the six-month review hearing on January 8, 2013, and counsel was appointed to represent him. The court continued the hearing to February 7, 2013 to allow father's counsel time "to get familiar with the case." On that date, father's appointed counsel was ill and another attorney stood in for her. Father's temporary replacement counsel said that he had not reviewed the file or spoken with father yet and asked for a continuance to allow father's appointed counsel an opportunity to appear in court on this matter. The court denied the request and the hearing went forward.

The Department reported that father had visited Suhey in California, and had maintained daily contact with her since he had returned to Idaho. Suhey seemed "happy and comfortable" when speaking about father and said she might like to live with him. The trial court terminated mother's reunification services, ordered that father be given services to assist him with visiting Suhey, and ordered an ICPC evaluation. The court noted that maternal relatives "seemed very favorable of the father" and that "Suhey had a very good -- had very good visits with him when he was visiting her." On the same day, February 7, 2013, the court set a section 366.26 hearing for June 5, 2013, stating

7

that it believed it was required to set the hearing, and that "in any event, [] that would also give us the update on the I.C.P.C." Father's writ petition followed.[15]

The Department's records reflect that, on February 19, 2013, a second child abuse referral had been generated.[16] A mandated reporter said Suhey had "green and purple" bruising on her face, that it looked like the child had been hit, and that Suhey came to the reporter and said "I don't want to go home." The Department investigated the referral. Maternal aunt was "exasperated" and verbally aggressive when the investigator came to her home and said Suhey was "very clumsy, and often falls and injures herself."

The Department's investigation also determined that Suhey, her three cousins, and maternal aunt had all given different accounts of how Suhey received the bruise but each one denied that anyone had hit Suhey. Two of Suhey's cousins said that maternal aunt spanked them. However, maternal aunt said she disciplined the children "with time outs or taking away their privileges." The Department concluded that the abuse allegations were "unfounded."

On February 25, 2013, the Department filed an Interim Review Report with the trial court stating that "[f]ather stated that . . . [1] he and his home were ready to meet all of Suhey's needs, [2] he has looked into the school that Suhey will be attending and

---

[15]     Father's petition included a request for a stay of the section 366.26 hearing scheduled for June 5, 2013. On May 15, 2013, we issued a stay of that hearing pending further order of this court.

[16]     These records, which documented the Department's continuing activities in this case, were filed, as supplemental records, in this case on August 26 and September 24, 2013 while these writ proceedings were pending.

8

[3] he was committed to fully care for Suhey." The Department further stated that it had "made a referral to ICPC for father in Idaho" and identified the long-term plan for Suhey as reunification and placement with father. The report did not inform the trial court about the two child abuse referrals reflected in its records.

On March 28, 2013, the Department filed a "Last Minute Information for the Court" with the trial court stating that the "ICPC Coordinator" had not received the referral for father, but that the forms were later submitted on March 20, 2013, almost six weeks after the court had ordered the ICPC investigation. At a progress hearing on March 28, 2013, the court gave the Department the discretion to liberalize father's visits and release Suhey to him. The Department, however, did not do so.

On April 24, 2013, a third child abuse referral was generated. A mandated reporter said that Suhey had a "swollen purple and blue bruise (about [three] inches) on her face from her cheek bone to her eye and the bruise appears like some[one] punched her face." The reporter "also stated that the bruise is similar to the ones that [Suhey] had before," and that the reporter was "concerned for the safety of Suhey in this home because on [three] different occasions [recently], Suhey has been seen with bruises like the one that she has today."

The Department also investigated this referral. Suhey said she "hit her face on the wheel of the bed" and denied that maternal aunt hit her. One of Suhey's cousins said that maternal aunt and uncle spanked her sisters, and that they also "hit" Suhey. A second cousin, however, said that maternal aunt and uncle did not hit or spank her, her sisters or Suhey. A third cousin said maternal aunt and uncle did not spank anyone.

9

Maternal aunt denied hitting or spanking the children, and said that Suhey had told her she had hit her face on the bed. The Department determined that the abuse allegations were "inconclusive." This third report of injury to Suhey was likewise not reported to the trial court.

On May 31, 2013, Suhey was asked if she wanted to live with father and she said "that she did want to go and live with her father," "that she talks to him on a regular basis," and "that he is nice to her." Despite Suhey's clearly expressed wishes and all of the information in its files, on June 5, 2013, the Department filed a Section 366.26 Report identifying the long-term goal for Suhey as adoption and recommended terminating father's parental rights with no explanation as to why the goal had changed from placement with father.[17]

In the Section 366.26 Report, the Department also briefly informed the trial court, *for the first time*, that there had been three child abuse referrals over the past six months concerning Suhey. The report set forth the dates of the referrals and stated (1) that the referrals alleged that Suhey was the victim of "general neglect" by maternal aunt and "physical abuse" by an "unknown perpetrator," and (2) the Department's conclusion that the February referral was "unfounded" and the "likely disposition" for the April referral was "inconclusive." The Department, however, did not further inform the court as to the substance of the abuse allegations or its investigation of the referrals, but continued to recommend adoption by maternal aunt and uncle and, inexplicably,

---

[17] The section 366.26 hearing at this time was still stayed pursuant to this court's order.

10

advised the court that "the family had developed an even closer loving relationship with one another."

At the June 5, 2013 hearing, the court again gave the Department discretion to liberalize father's visits with Suhey and to release Suhey to father. Again, however, the Department did not do so. The court's order did not address the alleged abuse of Suhey. Less than two weeks later, a fourth child abuse referral alleging physical abuse was made. A mandated reporter stated that (1) Suhey had a black eye with "swelling and bruising" under the eye, (2) the reporter was concerned because this was the fourth child abuse report for Suhey in the last six months, and (3) the child had a troublesome pattern of absences from school whenever she was injured. The record does not reflect the nature of investigation the Department undertook in response to this referral, but indicates only that the investigation was never completed.

In late June or early July, maternal aunt brought Suhey in to the Department and said she wanted to "give her up" and that she "didn't want her anymore." On July 31, 2013, the social worker conducted a visit and observed bruising on Suhey's cheek. When the social worker asked Suhey how she received the bruise, Suhey "could not say but shrugged her shoulders." Maternal aunt said that Suhey fell.

In spite of all of these circumstances, on August 8, 2013, the Department filed a Status Review Report stating that Suhey was "thriving" in maternal aunt's home, had a "strong emotional attachment" to her, that maternal aunt was providing Suhey with a "loving and stable environment." The Department did not inform the court, in this report, that maternal aunt had attempted to "give up" Suhey to the Department or that

11

a social worker had observed bruising on Suhey's face the week prior. The Department, however, did advise the trial court that a child abuse referral alleging physical abuse had been made on June 17, 2013, and that it was "under investigation."[18]

On August 8, 2013, the Department also submitted the results of the ICPC investigation to the trial court which made only positive findings about father and his home: (1) father and his wife were eager to have Suhey live with them; (2) had space in their home for Suhey, a supportive family network, and several positive references; and (3) were willing to participate in parenting classes and family counseling.[19] Despite the positive ICPC report and maternal aunt's attempt to "give up" Suhey (and all of the information it had in its files pointing to possible physical abuse), the Department's report nonetheless recommended that maternal aunt be allowed to adopt the child.

On September 13, 2013, one month after the initial oral argument before this court, the Department received a fifth child abuse referral alleging that Suhey had suspicious bruises. A social worker investigated the allegations and found that maternal aunt had been physically abusing Suhey. Suhey was removed from maternal aunt's home, and the Department agreed to release her to father.

---

[18] At the initial oral argument before this court, on August 13, 2013, the Department's counsel did not inform this court that there had been numerous child abuse referrals relating to Suhey.

[19] The Department's counsel also failed to inform this court, on August 13, 2013, that the ICPC investigation under review had, in fact, been completed, was in the possession of the Department, and was favorable to father. In addition, counsel did not inform this court that such report had been submitted to the trial court nearly one week previously.

12

In a Detention Report filed on September 18, 2013, the Department, for the first time, informed the trial court of the *substance* of the child abuse referrals going back to December 2012.  The Department also filed a section 387[20] petition against maternal aunt alleging that she had abused Suhey on numerous occasions by striking Suhey's face with a sandal.  On September 25, 2013, the court sustained the petition and ordered that Suhey be placed in the "home of parent  - father under the supervision of the [Department]."  The court set a hearing for October 7, 2013, at which it would consider an exit order for Suhey.

## *CONTENTIONS*

Father contends that the court erred in ordering an ICPC evaluation of father because the ICPC does not apply to out-of-state placements with a parent.  More significantly, father contends that the court erred in setting a section 366.26 hearing without considering his request for custody of Suhey under section 361.2.

---

[20]     Section 387 provides that the Department may file a supplemental petition seeking to remove a child from the physical custody of a relative based upon a statement of facts showing that the previous disposition has not "been effective in the rehabilitation or protection of the child."  A section 387 hearing is bifurcated into "(1) an adjudicatory hearing on the merits of the allegations in the petition and (2) a disposition hearing on the need for the removal of the [children] from [their] current level of placement."  (*In re Javier G.* (2006) 137 Cal.App.4th 453, 460.)  At the section 387 disposition hearing, the court applies the same procedures that govern disposition hearings on a section 300 petition as set forth by the California Rules of Court.  (Cal. Rules of Court, Rule 5.565, subd. (e)(2).)  These rules contemplate that section 361.2 may be applied at the disposition hearing.  (Cal. Rules of Court, Rule 5.695, subd. (a)(7)(B).)

## DISCUSSION

### 1. *Standard of Review*

"An order scheduling a permanency planning hearing is nonappealable but may be subject to immediate writ review. (Welf. & Inst. Code, § 366.26, subd. (k).)" (*In re Catherine S.* (1991) 230 Cal.App.3d 1253, 1256.) In addition, "[a]ll court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 247.) Insofar as we are asked to resolve questions of law, our review is de novo (*In re A.L.* (2010) 190 Cal.App.4th 75, 78); but with respect to whether the trial court erred in ordering an ICPC evaluation of father, we apply the abuse of discretion test. (*In re K.D.* (2004) 124 Cal.App.4th 1013, 1018.) Although the Department argues that this appeal is now moot and urges us to simply dismiss it, we disagree, and, in any case, may exercise our discretion to retain jurisdiction of the matter in order to consider and resolve the issues raised by father because they are important and of continuing interest.[21] (*Environmental Charter High School v. Centinela Valley Union High School District, supra,* 122 Cal.App.4th at p. 144; *City of Morgan Hill v. Brown, supra,* 71 Cal.App.4th at p. 1121 at fn. 5.)

### 2. *The ICPC Evaluation*

Father contends that the court abused its discretion by ordering an ICPC evaluation because the ICPC does not apply to out-of-state placements with a parent. The ICPC is a compact among California and other states, the purpose of which is " 'to

---

[21] The Department's motion to dismiss is therefore denied.

facilitate the cooperation between states in the placement and monitoring of dependent children.' [Citation.]" (*In re John M.* (2006) 141 Cal.App.4th 1564, 1573.) Pursuant to the ICPC, no child shall be "sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state [] notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." (Fam. Code, § 7901, art. (3), subd. (d).)

"Placement with an out-of-state *parent* need not follow ICPC procedure, as is plain from the statutory language[:] . . . [¶] The ICPC governs conditions for out-of-state 'placement in *foster care* or as a preliminary to a possible *adoption.*' [Citation.]" (*In re John M., supra,* 141 Cal.App.4th at p. 1573 (emphasis added); see also *In re Johnny S.* (1995) 40 Cal.App.4th 969, 979 [holding "that the provisions of the ICPC are not *mandatory* in connection with placement of a child with a natural parent in another state"].) However, although "ICPC compliance is not required for an out-of-state placement with a parent, nothing in the ICPC prevents the use of an ICPC evaluation as a means of gathering information before placing a child with such a parent." (*In re John M., supra,* 141 Cal.App.4th at p. 1572.)

Although an ICPC evaluation was not legally required prior to placing Suhey with father, the court had discretion to use such evaluation "as a means of gathering information" about father for the purposes of determining whether placing Suhey with him would be detrimental to her. (*In re John M., supra*, 141 Cal.App.4th at p. 1572.) Accordingly, the court did not abuse its discretion in ordering an ICPC evaluation of father.

3.    *The Section 366.26 Hearing*

Father argues that the court should not have set a section 366.26 hearing without requiring the Department to meet its burden of showing that placement with father would be detrimental to Suhey under section 361.2.  Section 361.2 provides that, when a court orders removal of a child, it must determine "whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child."  If so, the court must place the child with that parent unless it finds that doing so poses a risk of harm to the child.  (§ 361.2, subdivision (a).)  "[Section 361.2's] language suggests that the statute is applicable only at the time the child is first removed from the custodial parent or guardian's home."[22]  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 453.)  Accordingly, the trial court would not generally be required to conduct a section 361.2 analysis at a six-month review hearing.

However, the Department now agrees that a section 361.2 analysis would be appropriate in this particular case given its inadequate efforts to locate father and provide him with timely notice of these proceedings.[23]  The court's denial of

---

[22]    Although section 361.2 applies only when the child is first removed from the custodial parent's home, its procedures must be followed if the court places a child with a noncustodial parent at a six-month review hearing.  (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451 [citing to C.R.C. Rule 1460]; see also C.R.C., Rule 5.710, subd. (b)(2).)

[23]    We sent the parties a Government Code section 68081 letter asking them to address how section 361.2 affected the proceedings.  The Department addressed the issue in two letter briefs, the second of which acknowledged that there were grounds in the record for a finding that its search for father had been deficient, "rendering the

16

reunification services to father was based on the Department's report stating that it had conducted a diligent search for father and had served father with notice of the proceedings at his last known address. As we further discuss below, it is clear from the record that the Department failed to properly serve father with timely (or any) notice of these proceedings. Therefore, a section 361.2 analysis would be appropriate.

"At the detention hearing, or as soon thereafter as practicable, the court shall inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers." (§ 316.2, subd. (a).) "If, after the court inquiry, one or more men are identified as an alleged father, each alleged father shall be provided notice at his last and usual place of abode by certified mail . . . . " (§ 316.2, subd. (b).) Here, father was identified as an alleged father at the detention hearing, and the Department repeatedly attempted to serve him with notice at an address in the fictional town of "Idaho, California." The Department does not dispute that it failed to provide father with notice at his "last and usual place of abode," and that there was not "clear and convincing evidence" that his whereabouts were unknown. (See fn. 23 *ante.*)

juvenile court's decision to deny father reunification services based on his unknown whereabouts, unfair." Therefore, the Department suggested that the court reverse the disposition order to the extent it "den[ied] reunification services to father under . . . section 361.5, subdivision (b)(1), and remand the matter back to the juvenile court to conduct a new disposition hearing as to father only and to conduct an analysis under section 361.2."

*Serendipitously*, father later found out about the proceedings from Suhey's maternal relatives.[24] He then contacted the Department and sought custody of Suhey.

Had father received timely notice of the disposition hearing, he would have had an opportunity to appear at that hearing and request custody of Suhey. If he had done so, he would have been entitled to custody of Suhey under section 361.2 unless the court made a finding that such custody would have been detrimental to Suhey. Instead, the trial court denied father reunification services because it found, based on the Department's report, that his whereabouts were unknown. The court then set a section 366.26 hearing to address the termination of parental rights and adoption of Suhey by her then current caregivers. The Department argues that, at that point, father's interest in reunification was, in its view, no longer a paramount concern and the burden shifted to him to file a petition under section 388 based upon changed circumstances in order to have Suhey placed with him. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) We disagree with this conclusion by the Department.

The Department's failure to properly serve father deprived him of the opportunity to appear at the disposition hearing and obtain custody under the section 361.2 framework. As a result, the burden should not have been shifted to father to show that Suhey should be placed with him. Rather the burden was on the Department, under section 361.2, to prove that placing Suhey in the custody of father would be detrimental to her, because, due to the Department's inadequate and

---

[24] It appears from the record that the Department never inquired of those maternal relatives as to father's actual location, information which, in fact, such relatives had.

18

ineffective service efforts, the court never obtained jurisdiction over father. (*In re Arlyne A.* (2000) 85 Cal.App.4th 591 [holding that the trial court failed to acquire personal jurisdiction over the father due to inadequate efforts to locate him and provide notice].) Had the trial court been aware of the Department's failure to properly serve father, it would have proceeded to adjudicate father's custody request under section 361.2 rather than set the section 366.26 hearing. Thus, we agree with father that he was entitled to have his claim for custody adjudicated under section 361.2.

It now appears that such claim has been, in fact, addressed. The record before us indicated that the trial court did, effectively, apply section 361.2 at the section 387 hearing when it placed Suhey with father, and therefore, father has now obtained the relief to which he was entitled all along.[25] In our view, this result was not precluded by *In re Zacharia D., supra,* 6 Cal.4th at p. 453.

4.    *The Department Failed to Adequately Address Evidence of Child Abuse and Failed to Facilitate Reunification of Suhey with Father*

This record clearly demonstrates that the Department failed to protect Suhey from being physically abused by her maternal aunt. The multiple reports of child abuse in this case deserved far more attention than was devoted to them by the Department. Mandated reporters repeatedly notified the Department of their concerns that Suhey showed marks of severe physical abuse and had stated that she was afraid to go home.

---

[25]    The California Rules of Court contemplate that section 361.2 may be applied at the disposition hearing of a section 387 petition. (See Cal. Rules of Court, Rule 5.565, subd. (e)(2) [providing that the procedures relating to disposition hearings govern supplemental petitions under section 387]; Cal. Rules of Court, Rule 5.695, subd. (a)(7)(B) [providing that, at the disposition hearing, the court may "order custody to the noncustodial parent with services to one or both parents."])

The Department's own investigation of the abuse referrals revealed troubling inconsistencies in maternal aunt's and her children's accounts of how Suhey received her injuries and regarding maternal aunt's use of corporal punishment. However, the Department nonetheless concluded time after time that Suhey should remain in maternal aunt's home and was, in fact, thriving in her care.

The Department also did not keep the trial court informed about the reports or evidence of abuse in the foster home, and misrepresented to that court the state of that home. [26] For example, there is no way to reconcile the fact that maternal aunt brought Suhey in to the Department in an attempt to "give her up" because she "didn't want her anymore," and the Department's *subsequent* report to the trial court that maternal aunt was providing Suhey with a "loving and stable environment."

Further, there is no justifiable explanation as to why it took almost six months for the Department to inform the trial court about the multiple reports of child abuse in the foster home, and almost ten months to inform it of the substance of those allegations. The first child abuse referral occurred in December 2012, but it was not until June 2013 − after three child abuse referrals had been made − that the Department included

---

[26]     There is also no indication in the record that children's counsel was informed about the child abuse referrals. In our view, it should be part of the Department's responsibility to keep children's counsel informed of all such referrals during the course of a dependency case. Given that it is children's counsel's duty to advocate for the "protection, safety, and physical and emotional well-being" of her client, the Department should adopt a practice of providing timely notice to counsel of all such referrals. (See section 317, subd. (c) ["A primary responsibility of counsel appointed to represent a child or nonminor dependent pursuant to this section shall be to advocate for the protection, safety, and physical and emotional well-being of the child or nonminor dependent."])

any information about these referrals in its reports to the court. Moreover, the Department's June 2013 report provided the court with only a minimal description of the referrals − that there had been allegations of "physical abuse" by an "unknown perpetrator" − and withheld from the court the fact that mandated reporters had repeatedly reported severe bruising on Suhey's face, that Suhey had said she was afraid to go home, and that the Department's investigations had revealed substantial inconsistencies in the foster family's accounts of how Suhey had received her injuries. The Department (through its attorney) also failed to inform this court at the first oral argument in this matter (August 13, 2013) as to critical information regarding such abuse that it had in its possession.

The record in this case demonstrates that the Department failed to carry out its goal of reunifying dependent children with non-offending parents. The Department repeatedly gave notice to father at an address in a city that does not exist, and recommended adoption by the maternal aunt − who was ultimately determined to have abused Suhey over a period of ten months − over reunification with father despite the positive reports about father and his home. In addition, while the trial court ordered the Department to give father services to assist him with visiting Suhey, there is no evidence in the record that the Department ever provided such services to him.[27]

---

[27] From this record, we can only sadly conclude that the Department repeatedly failed to discharge its responsibilities to both father and Suhey. It also appears that the trial court was never provided with a full and complete statement as to all of the material facts known to the Department until September 18, 2013 which was very late in these proceedings and well after the initial oral argument before this court on August 13, 2013. Finally, it appears to us that Suhey's eventual reunification with

## *DISPOSITION*

Father's petition is denied with respect to the trial court's order for an ICPC evaluation. The petition is otherwise granted and, on remand, the trial court is directed to conduct such further proceedings as may be required and which are consistent with the views expressed herein. In all future proceedings in this case, the court's order placing Suhey with father shall be deemed to have been made under section 361.2.

***CERTIFIED FOR PUBLICATION***

CROSKEY, Acting P. J.

WE CONCUR:

KITCHING, J.

ALDRICH, J.

---

father resulted more from the chance occurrence of events than from the Department's exercise of the care and diligence that it owes to the people of Los Angeles County and the dependent minor children entrusted to it.