Filed 2/22/22  In re E.S. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).   This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.S., A Person Coming Under the Juvenile Court Law. | B308916 |
| | Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. 19CCJP00863 |
| Plaintiff and Respondent, | |
| v. | |
| E.H., | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Martha A. Matthews, Judge.  Affirmed.

Michelle E. Butler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

Father challenges orders placing his daughter E.S. with an out-of-state nonrelated family member and later terminating dependency jurisdiction with a legal guardianship for the nonrelated family member.  Father contends the court made the original placement order in violation of the Interstate Compact on the Placement of Children (ICPC or Compact, Fam. Code, § 7901 et seq.) and he maintains the evidence was insufficient to support the court's finding that returning E.S. to his custody would be detrimental to the child's health and safety. He also argues the court erred in denying his petition to modify the order terminating reunification services without a hearing. (See Welf. & Inst. Code, § 388.)[1]  We affirm.

## FACTS AND PROCEDURAL HISTORY

### 1.    *The Dependency Petition*

E.S. was born in February 2010.  Her half-sister Z.S., mother's second daughter, was born in 2013.  At the time of detention, E.S. and Z.S. lived with mother in Los Angeles County. Father lived in Colorado.

On January 3, 2019, the Los Angeles County Department of Children and Family Services (Department) received a report that mother had been arrested for child endangerment and public intoxication after her Uber driver contacted law enforcement to report mother was incoherent and did not have a car seat for Z.S. E.S. was with a babysitter at the time of the incident.

On February 7, 2019, the Department filed a dependency petition under section 300, subdivisions (b) and (j), alleging E.S. and Z.S. were at risk of serious physical harm due to mother

---

[1]    Statutory references are to the Welfare and Institutions Code, unless otherwise designated.

endangering Z.S. while intoxicated.  The petition said father's "whereabouts [were] unknown."

## 2.    *Efforts to Locate Father*

Mother initially refused to provide the Department with father's contact information because she did not want him "involved" in the case.  Approximately two weeks after the referral, she disclosed father's name, but told her social worker father suffered from mental health issues, he had "set himself on fire," and she had obtained a restraining order against him.  She provided a court order from Colorado designating her E.S.'s "primary caretaker" with "[s]ole parental responsibility" and granting father monitored visitation.  Mother said she and E.S. had not seen father since 2016, when he was in a "mental hospital."

In March 2019, the Department interviewed E.S. about her relationship with father.  E.S. said she last saw father "[a] long time ago."  She did not recall talking to father on the telephone.  However, when asked how she got along with father, E.S. responded, "He's my best friend.  He would take me to the park and make cookies with me.  My dad would take me everywhere."

On February 8, 2019, the juvenile court held a detention hearing.  The court found father to be E.S.'s presumed father, detained E.S. from parental custody, placed her in foster care, and ordered the Department to conduct a due diligence search to locate father.

On March 14, 2019, the Department reported it had initiated a due diligence search for father but still had not located him.  On May 16 and 20, 2019, the Department reported father's whereabouts remained unknown.

On May 20, 2019, the juvenile court sustained the petition and declared E.S. a dependent child. The court continued the disposition hearing because the Department still had not located father.

On June 24 and August 20, 2019, the Department filed due diligence reports detailing its continued but still unsuccessful efforts to locate father.

### 3. *Disposition*

On August 22, 2019, the Department received a telephone call from father, who said he had spoken with mother "a few months ago" about E.S.'s dependency case. Father acknowledged there was a Colorado custody order granting mother sole custody of E.S., but he said he wanted to have the order changed because mother was not allowing him to have consistent contact with the child. He had not seen E.S. in person "for quite some time." He reported he was on disability and mother received child support out of his disability income.

Father acknowledged he had set himself on fire while E.S. was asleep in the house, but he said the incident was a " 'one-time thing.' " He said he was treated medically for his injuries and placed on a "72[-]hour hold." He was ordered to participate in and completed domestic violence, parenting, and individual therapy services. He said he had never harmed himself again.

On September 4, 2019, father made his first appearance in the case by telephone. He submitted to the court's jurisdiction, and the court noted he was "not offending in the petition." Father asked to have E.S. placed in his custody. The court set the matter for a hearing and ordered the Department to interview father and to work with Colorado authorities to

4

obtain a courtesy assessment of his home and information on the family's child welfare history in the state.[2]

In advance of the hearing, the Department reported E.S. and her half-sibling Z.S. had spent the Thanksgiving holiday with Z.S.'s paternal family in Ohio. Both children enjoyed their time together and were reluctant to leave.

The Department also interviewed father about the child welfare case in Colorado. Father said the case began due to mother falsely accusing him of physical abuse. He denied abusing mother, despite a police report indicating multiple witnesses saw him hit her. Father said the incident with the police triggered a " 'mental breakdown' " that had been building from " 'normal everyday stresses.' " He said he " 'just didn't have enough time to think about the situation' " and set himself " 'on fire with lighter fluid and a lighter.' " He acknowledged he was using alcohol at the time to cope with his personal problems but denied he was under the influence of alcohol that day. He also denied any suicidal ideation at the time or since then. As a result of the incident, father claimed he "took a plea deal," which included admitting to the domestic violence charge and participating in parenting, substance abuse, and domestic violence counseling.

On December 3, 2019, the juvenile court held the disposition hearing. The court released E.S.'s half-sister to

---

[2] Following the hearing, the juvenile court held a conference call with a Colorado judge regarding the existing custody order. The Colorado court found "[t]he child and the child's custodian or parent no longer have a significant connection with Colorado" and therefore the Colorado court "would not maintain or retain jurisdiction" over the family.

her father's custody in Ohio. Counsel for E.S. informed the court E.S. wanted to live with her half-sister in Ohio and requested an expedited request for ICPC approval. Father objected to E.S. being placed in Ohio.

The juvenile court denied father's request to have E.S. placed in his custody, finding the Department had met its burden of proof for removing the child from parental custody. The court ordered E.S. to remain in her current foster placement and ordered the Department to initiate an expedited ICPC request regarding E.S.'s half-sister's paternal grandmother in Ohio. The court ordered the Department to "walk the matter on" if it received ICPC approval. The court also granted E.S.'s counsel's request for an extended holiday visit with her half-sister's relatives in Ohio.

The court ordered reunification services for father, including unmonitored telephone visits with E.S. at least three times per week and monitored in-person contact as much as possible. As part of his case plan, the court ordered father to undergo a psychological assessment and psychiatric evaluation, to take all prescribed medication, and to engage in individual counseling, including mental health, child safety, and domestic violence counseling. Although the court questioned whether an ICPC approval for father's home in Colorado was required, it ordered the Department to initiate the process "[j]ust in case."

4. ***Father's Mental Health Evaluation***

On January 9, 2020, father underwent a mental health evaluation. Father's records indicated he was hospitalized in 2011 following the incident when he set himself on fire. He had participated in therapy following his hospitalization and was diagnosed with alcohol abuse and a mood disorder.

He received treatment in 2012 and 2013, attending approximately 11 appointments and missing or cancelling nine. Father was hospitalized again in 2016, when he reported feeling suicidal due to an argument with a family member.  His primary care physician prescribed him antidepressants, but father was not taking the medication.

Father's records showed he began drinking alcohol " 'on a daily basis at the age of 21' " and he was convicted of two driving under the influence offenses.  Father said he typically drank one to three beers daily.  He acknowledged he had a beer before the incident when he lit himself on fire and, although he stopped drinking while on probation, he resumed drinking after his probation and continued drinking after he was released from the hospital.  Father denied that he had consumed alcohol in the past " 'three or four years.' "

After interviewing father about his mental health history and reviewing his medical records, the evaluator concluded father met the criteria for depressive disorder and alcohol use disorder. The evaluator recommended regular contact with mental health professionals and "dual diagnosis evaluation and management" to help father manage "the interplay between psychiatric and substance abuse issues."

The Department reported that it had discussed the court-ordered mental health services with father on three occasions between December 2019 and February 2020.  Father told his social worker he did "not need mental health services since [he] participated in mental health services before."

**5.** ***Travel Request, ICPC Approval, and E.S.'s Placement with Her Half-Sister's Grandmother in Ohio***

On March 4, 2020, the juvenile court granted the Department's ex parte application for authorization to allow E.S. to visit her half-sister in Ohio from March 13 to March 20, 2020.

On March 17, 2020, the Department informed father that E.S. might stay in Ohio due to concerns over COVID-19. Father said he was not happy about E.S. staying in Ohio. There is nothing in the record to suggest the Department informed the court about the change to E.S.'s out-of-state visit.

On May 5, 2020, the Department received ICPC approval for the home of E.S.'s half-sister's grandmother T.B. in Ohio. There is no contemporaneous record of the Department "walking on" the approval as the juvenile court had ordered; however, a subsequent report filed by the Department on March 3, 2021 stated that E.S.'s placement with T.B. in Ohio began on May 15, 2020.

On July 22, 2020, the Department notified father that Colorado's ICPC unit had denied the request for approval for placement in father's home. When father questioned the basis for the denial, his social worker encouraged him to contact the Colorado ICPC unit to obtain more information. The social worker also encouraged father to comply with his court-ordered case plan to obtain mental health therapy, but father responded, "[W]hat's the point of doing anything, I am not going to be reunified."

In August 2020, the Department spoke with father again about the need to follow the court's order to obtain mental health therapy. Father again said there was "no use to follow up with anything," as he lost his parental rights a long time ago.

8

On September 9, 2020, the Department reported E.S. was residing with T.B. in Ohio. T.B. was meeting E.S.'s needs, providing a nurturing environment, and establishing a strong bond with E.S. E.S. called T.B. " 'grama' " and said she was happy living with T.B. and her half-sister. She wanted to continue living with them.

**6.** *Section 366.21, Subdivision (e) Review Hearing and Father's First Appeal*

On September 11, 2020, the juvenile court held a review hearing under section 366.21, subdivision (e). Father attended the hearing virtually. The court found the Department had provided reasonable services and found the parents were in "partial compliance with the case plan." The court found that returning E.S. to the parents' custody would create a substantial risk of detriment to the child and ordered continued out-of-home placement with T.B. in Ohio.

On November 10, 2020, father filed an appeal from the orders made at the September 11, 2020 hearing.

**7.** *Combined Section 366.21, Subdivision (f) and Section 366.22 Permanency Hearing*

On November 18, 2020, the court held a permanency hearing under sections 366.21, subdivision (f) and 366.22, which father attended by telephone.

E.S.'s counsel supported termination of reunification services, as the case was at the 18-month date. She said E.S. now wished to return home to mother. Mother requested E.S.'s return or a brief period of additional reunification services. Father supported placement with mother. He also objected to the termination of his services and requested a brief extension.

The juvenile court declined to return E.S. to mother, finding mother was either in "denial about an underlying drug or alcohol problem or . . . there is some sort of mental health issue," and it was "not a safe situation" for E.S.  The court likewise found placing E.S. with father would be detrimental to her health and safety, citing father's past "mental health issues," his limited contact with E.S., and the lack of progress on his case plan.

The court terminated reunification services and set a hearing under section 366.26.  The court ordered the clerk to provide the parents with the "writ advisement."  When the Department's counsel later asked the court if it gave the parents the writ advisement, the court responded, "I did," adding, "I said the clerk of the court is to send them the writ advisement."

## 8.    *Father's Section 388 Petition for Modification*

On March 17, 2021, father filed a section 388 petition to modify the order terminating his reunification services by restarting those services.  With respect to changed circumstances, father alleged he had been attending individual counseling since February 2021 and his therapist reported "no concerns about his mental health or stability."  Father said he was "making progress towards his treatment goals" and he would "continue to engage in mental health services."  With his petition, father submitted a letter from a therapist confirming father had been "actively involved in weekly psychotherapy from February 16, 2021 to present."  The therapist also said father exhibited "progress towards established clinical goals," he appeared "highly motivated to enhance the relationship with his daughter," he appeared "competent in areas of child safety [and] protection . . . , with no direct clinical concerns," and he presented "a low risk with no active or recent suicidal/homicidal features that would

10

warrant concern regarding his ability to effectively parent at this time."

As for why the requested modification would be in E.S.'s best interest, father's petition alleged: "Father is dedicated to being a stable and healthy parent for his daughter, and closing this case with legal guardianship prior to exhausting all legal available remedies for the child to live with and be cared for by her own parent would be against the child's best interest."

### 9. *Section 366.26 Hearing*

On March 17, 2021, the juvenile court held the scheduled section 366.26 hearing and considered father's section 388 petition. The Department opposed the petition, arguing father failed to make a prima facie showing that restarting reunification services was in E.S.'s best interest. It recommended terminating jurisdiction with legal guardianship in place for E.S.'s half-sister's grandmother T.B. in Ohio. E.S.'s counsel supported the Department's recommendation. Father objected to the legal guardianship.

The juvenile court denied the section 388 petition, concluding father failed to make a prima facie showing either of changed circumstances or that restarting services would be in E.S.'s best interests. The court acknowledged father was in a "difficult position in that he lives in Colorado," but determined "enroll[ing] in therapy one month ago after the end of the reunification period" was not sufficient to show changed circumstances after the case had "been open for two years." And the court determined there "certainly" had not been "a prima facie showing regarding best interest."

The court found it would be detrimental to E.S. to return the child to the parents' custody, ordered legal guardianship

11

as E.S.'s permanent plan, and appointed T.B. the child's legal guardian with weekly virtual visits for father and twice yearly monitored in-person visits in Ohio. The court terminated jurisdiction and advised the parties they could return to court to seek modifications to the guardianship in the future.

Father timely appealed the March 17, 2021 findings and orders.

We consolidated father's appeal from the September 11, 2020 orders with his appeal from the March 17, 2021 orders.

## DISCUSSION

1. ***Good Cause Exists to Review the Placement Order, Notwithstanding Father's Failure to File a Writ Petition Challenging the Order Setting a Section 366.26 Hearing***

In addition to appealing the order terminating jurisdiction with a legal guardianship, father appealed the September 11, 2020 order, made after the section 366.21, subdivision (e) review hearing, denying his request for physical custody and placing E.S. with her half-sibling's grandmother under the ICPC. Two months later, while that appeal was pending, the juvenile court held a combined 12-month and 18-month permanency hearing under sections 366.21, subdivision (f) and 366.22, where the court reaffirmed the out-of-state placement continued to be appropriate and in E.S.'s best interests, terminated reunification services, and set a section 366.26 hearing. The Department contends this subsequent order rendered father's appeal from the September 11, 2020 placement order moot, and father's failure to challenge the order setting the section 366.26 hearing by a writ petition forfeits his right to obtain appellate review of the placement order. However, the record shows the juvenile

12

court failed to discharge its duty to give oral notice of the writ requirement. In view of the court's oversight, father has shown good cause for his failure to file a petition for an extraordinary writ challenging the subsequent placement order. (See *Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254, 259–260 (*Jennifer T.*); *In re Cathina W.* (1998) 68 Cal.App.4th 716, 722–724 (*Cathina W.*).)

"An order setting a section 366.26 hearing 'is not appealable; direct appellate consideration of the propriety of the setting order may be had only by petition for extraordinary writ review of the order.'" (*Jennifer T., supra,* 159 Cal.App.4th at p. 260; § 366.26, subd. (l).) "In addition, '[a]ll court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ.'" (*In re Suhey G.* (2013) 221 Cal.App.4th 732, 742; *In re Merrick V.* (2004) 122 Cal.App.4th 235, 247.)

"When the juvenile court orders a hearing under section 366.26, the court must orally advise all parties present that if a party wishes to preserve any right to review on appeal of the order setting the hearing under section 366.26, the party is required to seek an extraordinary writ." (*Jennifer T.*, *supra,* 159 Cal.App.4th at p. 259; § 366.26, subd. (l)(3)(A)(i); see also Cal. Rules of Court, rule 5.590(b)(1).)[3] "The advisement must include the time for filing a notice of intent to file a writ petition." (Rule 5.590(b)(3); see also rule 8.450(e)(4)(A).)

The record shows father was present by telephone at the combined 366.21, subdivision (f) and section 366.22 hearing,

---

[3] Rule references are to the California Rules of Court.

which the juvenile court held virtually due to COVID-19 restrictions. However, the hearing transcript reveals the court verbally directed only *the clerk* to "provide [the parties] with writ advisement." The court did not verbally advise father of the writ requirement, let alone of the time for filing a notice of intent to file a writ petition. Indeed, when the Department's counsel later asked the court if it was going to give the writ advisement, the court responded, "I did," adding, "I said the clerk of the court is to send them the writ advisement." While the minute order confirms the court clerk served the parties with a written writ advisement, this was not sufficient to satisfy the mandate to "orally" advise all parties present of the requirement to file a petition for extraordinary writ. (§ 366.26, subd. (l)(3)(A)(i); see *Jennifer T., supra,* 159 Cal.App.4th at p. 259.)

In *Cathina W.*, the court held the juvenile court's failure to advise the mother of her writ rights constituted "good cause" for the mother to obtain appellate review of the merits of the setting order on her appeal from the termination order. (*Cathina W., supra,* 68 Cal.App.4th at pp. 722–724.) Here, father timely appealed the termination order and the September 11, 2020 order placing E.S. with an out-of-state caregiver under the ICPC. He did not file a writ petition from the November 18, 2020 setting order, entered while his earlier appeal was pending, in which the court reaffirmed the findings underlying the ICPC placement. Due to the juvenile court's failure to discharge its duty under section 366.26, subdivision (l), we conclude good cause exists to review the merits of his appeal from the initial placement, as well as his challenge to the reaffirmed placement findings as part of his appeal from the termination order.

14

(*Cathina W.,* at pp. 722–724; see also *Jennifer T., supra,* 159 Cal.App.4th at p. 260 [construing appeal from order setting section 366.26 hearing as a petition for writ of mandate].)

**2.      *Father Fails to Establish Prejudice from the Apparent Failure to Comply with ICPC Mandates***

Father contends the Department failed to comply with the juvenile court's order to "walk the matter on" once it received ICPC approval from Ohio, and he argues the court erred in failing to confirm ICPC approval once E.S.'s March 2020 visit to Ohio became a placement under the ICPC.  He argues these errors require reversal of the placement order and the subsequent guardianship.  It appears from the record that the Department and juvenile court failed to comply with ICPC mandates; however, under the circumstances of this case, we conclude reversal of the guardianship is not appropriate.

The ICPC is an agreement between California and other jurisdictions that governs "sending, bringing, or causing any child to be sent or brought into a receiving state for placement in foster care or as a preliminary to a possible adoption."  (Fam. Code, § 7901, art. 3, subd. (b); *In re Luke L.* (1996) 44 Cal.App.4th 670, 681–682 (*Luke L.*).)  The Compact "prohibits sending a minor into the receiving state 'until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.' " (*Luke L.,* at p. 682; Fam. Code, § 7901, art. 3, subd. (d).)  Thus, before making an out-of-state placement, the juvenile court must receive and review written confirmation from the receiving state that the home is safe, stable, and appropriate.  (See rule 5.616(d)(2).)  Under section 366, subdivision (c), each review hearing "shall also address

whether the out-of-state placement continues to be the most appropriate placement selection and in the best interests of the child."

"By its terms, the ICPC applies only to a *placement*." (*Luke L., supra,* 44 Cal.App.4th at p. 682.) An order sending a child to an out-of-state person, other than a parent, "without a specific date of return" or "with a return date more than 30 days from the start of the visit" constitutes a "placement." (Rule 5.616(b)(1)(B)(i) & (ii).) "[C]ontingent or conditional placement orders" are not permitted. (*Luke L.*, at p. 682.) Thus, absent compliance with the ICPC, an order placing a child out of state with someone other than a parent for more than 30 days or without a specified return date constitutes a violation, even if the "court ma[kes] its order contingent on completion of the ICPC" requirements. (*Id.* at p. 682.)

Father contends the Department and the juvenile court violated the ICPC by allowing E.S. to stay in Ohio beyond 30 days without ICPC approval from the jurisdiction. The record shows the juvenile court authorized E.S. to visit her sibling and extended family in Ohio from March 13 to March 20, 2020, but, on March 17, 2020, the Department informed father that E.S. might stay in Ohio longer "due to [COVID]-19." The Department concedes this resulted in E.S. staying in Ohio without ICPC approval from March 13 until May 5, 2020, when the Ohio home was approved—a total of 53 days, which exceeded the 30-day limit for a visit under rule 5.616. There is no dispute that this violated the ICPC.

When a child remains in an out-of-state placement without an approved ICPC the proper remedy for the violation is to reverse the placement order. (*Luke L., supra,* 44 Cal.App.4th

16

at pp. 673–674.) However, under the circumstance here, we will not reverse the guardianship, as father requests. Before the date of the section 366.26 hearing, the Department received the ICPC approval from Ohio. Even if we were to reverse and remand the placement order that father challenges, our disposition would simply result in the juvenile court reinstating its original findings upon finding that all ICPC requirements were met. (See *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303–304 [no reversal where placement order would be the same absent error].) Because Ohio has approved the placement, there is nothing further for the juvenile court to review and remand to the court would serve no purpose. We cannot reverse the order under these circumstances.[4] (See Cal. Const., art. VI, § 13 [reversal not permitted if outcome would have been the same absent error]; *In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1122 [harmless error analysis applies when statutory mandate is disobeyed].)

**3.** ***Substantial Evidence Supports the Detriment Finding***

At each of the hearings held under sections 366.21, subdivision (e)(1), 366.21, subdivision (f)(1), and 366.22, the juvenile court is required to order the return of the child to the physical custody of her parent "unless the court finds, by a preponderance of the evidence, that the return of the child to

---

[4]     In reaching this conclusion we in no way sanction the Department's apparent disobedience of the juvenile court's visitation order or the resort to after-the-fact ICPC approval. This practice not only contravenes the explicit mandates of the ICPC, but it also subjects the Department to the possibility of sanctions. (See Fam. Code, § 7901, art. 4.)

17

his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§§ 366.21, subds. (e)(1) & (f)(1), 366.22, subd. (a)(1).) We may reverse the court's order declining to return the child to her parent's custody only if there is no substantial evidence to support the detriment finding. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763 (*Angela S.*).)

Father contends the Department unlawfully delegated its duty to investigate his home and current circumstances to Colorado authorities, without conducting its own investigation or presenting independent evidence of detriment to support the court's finding. In that regard, father emphasizes that the ICPC procedure does not apply to placement of a child with an out-of-state parent. (Rule 5.616(g) ["When a child will be placed with his or her parent in another state, compliance with the requirements of the ICPC is not required."]; *Tara S. v. Superior Court* (1993) 13 Cal.App.4th 1834, 1837 [law "limits the ICPC to foster care and possible adoption—neither of which would involve natural parents"]; cf. rule 5.616(g) [concerning out-of-state parent, juvenile court may direct child welfare agency to request an independent, non-ICPC home study or courtesy check, or request a home study from public or private agency in receiving state, and take any other steps necessary to ensure child's safety].)

While the record shows the Department advised father to consult Colorado authorities about the reasons ICPC approval of his home was denied, it does not establish the juvenile court relied upon Colorado's determination to find returning E.S. to father's custody would create a substantial risk of detriment to the child. Contrary to father's contention, the Department's

reports presented substantial evidence, independent of the Colorado ICPC determination, to support the juvenile court's detriment finding.

On January 9, 2020, father underwent a mental health evaluation that determined he met the criteria for depressive disorder and alcohol use disorder. The evaluator also reported father failed to participate regularly in mental health services in Colorado; he had a history of suicidal ideation; he attempted suicide by setting himself on fire; he refused to take prescribed psychotropic medication; he had a history of drinking alcohol to the point of blacking out; and he had multiple convictions for driving under the influence. Regarding the attempted suicide, the evaluator suggested the act could have been "the result of a chronic mental illness (or illnesses), an acute psychiatric issue, or a combination of mental illness and situational factors." The evaluator recommended father engage in "dual diagnosis" treatment to address both disorders and "the interplay between psychiatric and substance abuse issues." Despite this recommendation and the juvenile court's order to obtain treatment, the Department's reports disclosed that father persistently rebuffed his social worker's suggestion that he follow the court's order and enroll in mental health services. In each instance father either responded that he did not need mental health services or that there was "[no] point [to] doing anything" as he was "not going to [be] reunified."

The Department's reports also disclosed that father had not had regular contact with E.S. When the Department began its due diligence search for father in March 2019, mother reported father had last seen E.S. in 2016 and E.S. said she last spoke with father "[a] long time ago." In May 2020, after telling

19

the Department he did not feel comfortable contacting E.S. in Ohio, father took no action on his social worker's offer to personally arrange a call. In July and again in September 2020, father failed to follow up on the Department's request for a phone visitation schedule with E.S. And, although the Department reported father had contacted E.S. in September, October, and November 2020, it again noted he had not provided a schedule for regular visitation with the child.

Contrary to father's contention, in making its detriment finding, the juvenile court made no reference to the Colorado ICPC denial. Rather, the court observed, consistent with the mental health evaluation, that "father had struggled with some fairly serious mental health issues" and, although he "appeared to be in a somewhat better situation," he had "had very little contact with [E.S.] and ha[d] made very little progress on his case plan." Because the evidence presented in the Department's reports supported those observations and the court's detriment finding, we cannot reverse the placement order. (See *Angela S., supra,* 36 Cal.App.4th at p. 763.)

### 4. *Father Failed to Allege Sufficient Facts to Establish Restarting Reunification Services Would Be in E.S.'s Best Interests*

"Under section 388, a parent may petition the court to change, modify, or set aside a previous court order on the grounds of changed circumstances or new evidence." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188 (*Justice P.*); § 388, subd. (a).) The petition must allege why the requested change is "in the best interest of the dependent child." (§ 388, subd. (b)(1).) "If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . the court shall order that

20

a hearing be held." (§ 388, subd. (d).) "However, the court may summarily deny the motion if the petition fails to make a prima facie showing (1) of a change of circumstances or new evidence requiring a changed order, and (2) the requested change would promote the best interests of the child." (*Justice P.*, at pp. 188–189; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

"[A] petition must be liberally construed in favor of its sufficiency [citation] and a hearing may be denied only if the application fails to reveal any change of circumstance or new evidence which might require a change of order." (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413–1414, footnote omitted, citing rule 1432(a) & (b).) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*Justice P., supra,* 123 Cal.App.4th at p. 189; see *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450–1451.)

Father contends his petition plainly made a prima facie showing of changed circumstances. He notes that when the court terminated services in November 2020, it found he had made little progress in his services and had limited contact with E.S. At the time, father had completed a psychological evaluation but had not enrolled in therapy, despite the court's order to do so in December 2019. Father maintains his section 388 petition demonstrated "a substantial change" in that he had started attending weekly therapy sessions in February 2021 and his therapist reported he presented a "low risk with no active or recent suicidal/homicidal features that would warrant concern regarding his ability to effectively parent at this time." The Department counters that enrolling in treatment more than two months after reunification services were terminated and

21

only one month before the section 366.26 hearing is not sufficient to warrant a hearing under section 388. (See *In re Edward H.* (1996) 43 Cal.App.4th 584, 594 (*Edward H.*) ["on the eve of the section 366.26 permanency planning hearing—the children's interest in stability was the court's foremost concern and outweighed any interest in reunification"]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["[T]he change in circumstances must be substantial."].)

We need not decide whether one month of mental health treatment represented a sufficient change in circumstances to warrant a hearing, because we agree with the juvenile court that father's petition "certainly" did not make a prima facie showing that delaying permanency to restart reunification services would promote E.S.'s best interest. With respect to the child's interest, father's petition alleged: "Father is dedicated to being a stable and healthy parent for his daughter, and closing this case with legal guardianship prior to exhausting all legal available remedies for the child to live with and be cared for by her own parent would be against the child's best interest." The implicit premise of this allegation is that custody with a natural parent, as opposed to a nonrelated guardian, is presumptively in the child's best interest. However, "[t]he presumption favoring natural parents by itself does not satisfy the best interests prong of section 388." (*Justice P., supra,* 123 Cal.App.4th at p. 192.) As the *Justice P.* court explained, "[t]he cases that state a child may be better off with his or her biological parent rather than with strangers do so when the biological parent has shown a *sustained* commitment to the child and parenting responsibilities." (*Ibid.*, italics added, citing *Adoption of*

*Kelsey S*. (1992) 1 Cal.4th 816, 844–849; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1411.)

The entire factual record and procedural history of the case does not reveal the sort of sustained commitment to E.S. necessary to presume delaying permanency to allow father another chance to reunify would have promoted the child's interest.  (See *Justice P., supra,* 123 Cal.App.4th at pp. 189, 192.)  Before the family came to the Department's attention, a Colorado court had entered a custody order granting mother sole custody of E.S. after father pled guilty to a charge of domestic violence and was found to have endangered E.S. by lighting himself on fire while the child was asleep in the home.  Mother reported she and E.S. had not seen father since 2016, and E.S. said she had not spoken with father for "[a] long time."  Throughout the reunification period, father's social worker repeatedly encouraged him to comply with the court's order and enroll in mental health treatment.  Father persistently rebuffed this advice, telling his social worker he did not need mental health services or there was "no use to follow up with anything" as he lost his parental rights a long time ago.  When his social worker offered to facilitate phone visits with E.S. and requested a visitation schedule from father, father failed to follow up with the social worker's requests.  And, as the Department emphasizes, after the case had been pending for nearly two years, father waited for two months after his reunification services were terminated finally to enroll in treatment.  The factual record demonstrated at most that father was ready *to start* committing himself to reunification—not the sort of sustained commitment to E.S. and his parental responsibilities necessary to show delaying

23

permanency for the chance to reunite with a natural parent would be in E.S.'s best interest.[5]  (*Justice P.,* at pp. 189, 192.)

## DISPOSITION

The orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON, P.J.                                    LIPNER, J.[*]

---

[5]      Father argues the guardianship with T.B. "did not offer [E.S.] the permanency of placement with her Father."  This contention overlooks that father's petition did not seek placement and made no allegation to dispute the court's finding that returning E.S. to father's custody would be detrimental to the child.  Rather, father's petition sought only *to delay* the permanent plan for E.S. by restarting the reunification process.  When father presented his section 388 petition on the eve of the section 366.26 hearing, E.S.'s interest in stability was the court's foremost concern and outweighed any interest in the mere possibility of reunification with her natural father. (See *Edward H., supra,* 43 Cal.App.4th at p. 594.)

[*]      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.