Filed 12/20/23  T.S. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| T.S.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF RIVERSIDE COUNTY,<br><br>        Respondent;<br><br>RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Real Party in Interest. | E082221<br><br>(Super.Ct.No. RIJ2200133)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Mona M. Nemat, Judge.  Petition denied.

David A. Goldstein for Petitioner.

No appearance for Respondent.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel for Real Party In Interest.

1

At the 18-month hearing, the juvenile court terminated petitioner T.S.'s (mother) reunification services as to A.S. (minor, born January 2022) and set the Welfare and Institutions Code section 366.26[1] hearing. In this petition, mother contends insufficient evidence supports the court's finding that real party in interest, Riverside County Department of Public Social Services (the department), provided her reasonable reunification services. Mother also appears to argue that insufficient evidence supports the court's finding that it would be detrimental to "return" minor to her custody, i.e., that mother failed to make substantive progress in her services. The petition is denied.

## I. FACTUAL AND PROCEDURAL HISTORY

On January 19, 2022, the social worker arrived at the hospital where mother had recently given birth to minor.[2] The social worker offered "mother resources for housing, mental health services and substance use treatment." Mother rejected the services. Mother was discharged from the hospital.

The social worker requested law enforcement conduct a welfare check at mother's home. An officer indicated that mother was not there; the "relatives expressed to the Deputy that the mother was kicked out of the home and does not live there."

On January 20, 2022, the social worker conducted an unannounced visit to the home. Mother's friend said that mother was at the doctor's office with minor and would be returning home; mother's friend confirmed that mother lived at the residence. On the

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] The report does not reflect that the department received a referral; therefore, no reason for the social worker's appearance at the hospital is given.

2

same day, the social worker received an email reflecting that mother failed to show for minor's follow up appointment with the doctor.

On January 24, 2022, the social worker called mother, who hung up on her once the social worker identified herself. Mother later called the social worker back and apologized for hanging up on her. Mother reported she was working with her eligibility worker to obtain services. She said minor was the product of rape. The social worker offered her resources for victims of crimes, which mother rejected. Mother indicated she was working on obtaining section 8 housing.

The social worker contacted the local housing shelter and was informed that mother had recently arrived and would be provided 60 days of housing. Shelter personnel also informed the social worker that they would assist mother with section 8 and other housing resources. The social worker went to the shelter where shelter personnel informed her mother appeared to be doing well with minor.

The social worker received information regarding a prior dependency referral to Harris County Children's Services Division in Texas (Texas social services) involving mother in 2018. Mother had given birth to a child after which she tested positive for cocaine. Texas social services determined mother would not benefit from services; the child was placed with the maternal aunt who obtained legal guardianship of the child.

On January 28, 2022, the social worker met with mother at the shelter. Mother eventually agreed to participate in a mental health assessment, submit to a drug test, and

3

take minor for a follow up medical appointment. Mother tested negative for controlled substances. She brought minor to a doctor's appointment on January 31, 2022.

On February 11, 2022, the social worker received an immediate response referral from a medical social worker at the hospital. Mother was concerned that minor had COVID because mother had tested positive for COVID; however, the name on the test was not mother's: "The mother was exhibiting bizarre behaviors, such as, pretending to talk on the phone and no one was on the line." "The physician expressed concern for the baby's safety due to the mother not knowing how to properly measure the formula to water ratio. The physician furthermore shared the mother is not feeding . . . the baby properly and [minor] is slightly underweight." "Additionally, when the mother is given instruction[s] she does not appear to understand. They have a concern for the mother's mental health and stated the baby will be admitted for the evening to monitor her feedings, educate the mother on frequency of feedings, and treat [a] rash."

Mother disclosed that three years earlier, she had been placed in a mental hospital where "she was diagnosed with bipolar, mood swings, and anxiety and was prescribed Lexapro." She said her younger child had been taken from her at birth. Mother had been accused of abusing controlled substances. Mother sent the social worker a voice recording regarding Texas social services' involvement with her younger child. The recording indicated that mother needed "to be financially stable, mentally stable, [and] drug free" to regain custody of her younger child. On February 12, 2022, the social

4

worker placed minor into protective custody at the hospital pursuant to a protective custody warrant.

On February 15, 2022, the department filed a section 300 petition alleging mother suffered unresolved mental health issues (b-1), lived a transient lifestyle (b-2), had substance abuse issues (b-3), and had a previous history with Texas social services (b-4).[3] On February 16, 2022, the court temporarily detained minor.

In the February 23, 2022 addendum report, the social worker noted minor was moved from the hospital to a foster home on February 14, 2022. Mother both repeatedly requested and refused the social worker's offers of help regarding services. She declined an on-demand drug test. The social worker spoke with the maternal aunt who reported that mother's younger child was taken from mother at birth "due to the mother's unstable mental health and substance abuse." "She disclosed that the mother has had several psychiatric hospitalizations due to her stabbing the [younger child's], father . . . stabbing someone else, and not being mentally stable." The maternal aunt was "aware of the mother's past mental health diagnosis of bipolar and [said she] was on medication as a minor." "Lastly, the maternal aunt confirmed there was an open CPS case against the mother, she was given services; however, did not complete them and she was awarded 'custodial parent of' " the younger child. At the rehearing detention hearing on February 23, 2022, the court adopted its previous detention findings.

---

[3] The department filed an amended petition which did not substantively alter the allegations against mother.

In the jurisdiction and disposition report filed March 11, 2022, the social worker recommended the court find the allegations against mother true, remove minor, and offer mother reunification services. Mother admitted having unstable housing and previously using controlled substances.[4] Mother denied having mental health issues and having a previous history with Texas social services.

A caseworker for Texas social services reported that mother had aggressive behaviors, did not comply with case plan services, was placed in a psychiatric facility, and refused medical care. "It was determined [mother] had mental health concerns; she was referred for treatment. which she refused numerous times. [The case worker] stated in his opinion, it is not safe for a child to be left in the care of the mother due to her unresolved mental health condition."

Mother had supervised visitation with minor on March 8, and 10, 2022. During one visit, mother "appeared nervous and uncomfortable while holding [minor]. Overall, the visit was appropriate." The social worker provided mother referrals for substance abuse treatment program, parenting classes, medication evaluations, and individual counseling. She provided mother with a bus pass. Mother "participated in the development of the case plan and agreed to participate. She agreed to participate in individual counseling [and] parenting . . . . The mother has a scheduled intake on March 14, 2022, to begin her case plan services, through Riverside Substance Abuse Treatment program."

---

[4] Mother drug tested negative on February 16, 2022; however, the results were apparently not provided to the department until an addendum report filed July 15, 2022.

The social worker requested authorization for an Interstate Compact on the Placement of Children (ICPC) as to the maternal aunt so that minor could possibly be placed with her sibling in Texas. At a hearing on March 16, 2022, the court authorized an ICPC for the maternal aunt's home.[5]

On April 13, 2022, the social worker filed an addendum report in which she noted that mother appeared "committed to participat[ing] in services to reunify with her child, is interested in learning how to appropriately care [for minor], and wants to address her mental health concerns." At the hearing on April 18, 2022, mother's counsel reported that mother "would like to return to Texas. She has more support there." The court continued the matter for a contested jurisdictional hearing.

In the addendum report filed June 29, 2022, the social worker reported that mother failed to show for her intake appointment with the substance abuse program. Mother completed her intake for individual counseling on February 15, 2022, but did not begin counseling until April. Mother kept her psychiatry appointment on February 18, 2022,

_____

[5] Mother's intention and eventual move to Texas made placement with the maternal aunt preferable both because it would place minor with her sibling and near mother's place of future residence to facilitate in-person visitation. The court also authorized an ICPC for father, who lived in Texas and was the father of both mother's children. The court noted, as to the parents, "that ICPC is not required for placement, but it assists with . . . being out of the state for that to be in place." "[A]lthough '. . . ICPC compliance is not required for an out-of-state placement with a parent, nothing in the ICPC prevents the use of an ICPC evaluation as a means of gathering information before placing a child with such a parent.' [Citation.]" (*In re Suhey G.* (2013) 221 Cal.App.4th 732, 743 [The juvenile court has discretion to order an ICPC of an out-of-state parent " 'as a means of gathering information' ".])

Father's reunification services were terminated at the six-month hearing; he is not a party to this writ proceeding.

during which the psychiatrist prescribed her psychotropic medication. Mother missed her medication evaluation scheduled for April 18, 2022. However, she reported on April 25, and June 6, 2022.

Mother's therapist reported that mother was struggling with her mental health; she "is easily agitated, confused, makes thing up, forgetful, and minimizes her behavior when confronted." Mother was discharged from a Cal Works program on June 10, 2022, due to lack of participation. Mother refused to participate in services, did not want to engage in therapy sessions, and was not compliant with scheduled appointments. Mother was provided with referrals for additional services.

Mother transitioned from a family shelter to an adult community shelter to a hotel program; she was receiving guidance toward receiving a housing voucher. Through the shelter program, mother received one-on-one counseling. Mother completed a parenting program.

On July 15, 2022, the social worker filed another addendum report that reflected that mother had moved to Texas on July 7, 2022. On July 13, 2022, the social worker spoke to mother who reported she was staying with a friend until she could obtain housing. The social worker discussed mother's case plan with her. Mother said she had already completed her case plan. The social worker explained that mother still needed to complete individual counseling, medication evaluation, and drug testing. The social worker still needed to assess whether mother had benefited from her parenting class.

Mother indicated she would continue counseling with her former therapist. The social worker contacted the therapist who said he was not willing to provide services to mother because she was "difficult and uncooperative to work with and she does not follow through with appointments or therapeutic goals."

Visitation was scheduled twice weekly for an hour via Zoom. Mother's first supervised visit was canceled because mother was having issues with her phone and did not have internet services.

Mother testified via Zoom at the contested jurisdictional hearing on July 20, 2022, that it was her intent to stay in Texas and care for minor. She was taking the medication she had been prescribed for her anxiety: "I was seen by a psychologist and a therapist all together . . . as well as provided with a prescription for Lexapro." Mother was diagnosed with PTSD. She denied being diagnosed as Bipolar. Mother felt she could obtain appropriate housing if the court approved funding for her first month's rent. She was temporarily working.

Mother had not been using drugs: "I had three drug tests with the [department] development system, and I also had two drug tests done at the hospital when I was in birthing of my child." Mother had completed a parenting program for which she "received a lot of benefit on how to deal with feelings and being able to develop a better understanding on how, you know, to cope with how they are doing as far as how they feel about anything as far as parents or anything that they're wishing to have or anything like that." She had access to a counselor and psychologist.

Mother's counsel argued mother had completed her case plan and minor should be returned to her custody under a family maintenance plan. If the court was not inclined to so find, mother's counsel requested "authorizations in place so mom can present that to the appropriate authorities in Texas to secure appropriate housing, to secure appropriate services and be available to care for" minor. Counsel requested minor be placed with the maternal aunt in Texas.

The department noted that mother was discharged from her medical evaluation program due to lack of participation. The department had no verification mother was taking her prescribed medication: "I did not hear from mother's testimony that, in fact, she has the ability to refill her prescription, that she has a pending appointment for a psychiatrist or that she has a pending appointment for therapy, for that matter." Mother still did not have appropriate housing: "And just when we're able to get her situated, she decides she is returning to Texas."

The court found the b-1 allegation true, but struck the remaining allegations as to mother "as not having a nexus to the issues that brought the family to court." The court removed minor from mother's custody and granted her reunification services as provided in the department's plan, which included general counseling, medication evaluation, parenting education, and testing for controlled substances. The court warned that pursuant to section 366.21, subdivision (e), because minor was under the age of three when detained, the court could set a section 366.26 hearing in six months if mother did not make substantive progress in the plan.

On September 13, 2022, the department filed a request to authorize an ICPC for mother.[6] The ICPC referral for mother had been completed on October 24, 2022. On November 8, 2022, an ICPC staff member indicated there was "some probability of the child returning to the care and custody of the mother, if the Court were to order an additional six months of Family Reunification Services . . . ." The department was waiting on an update from ICPC staff in order to assess mother's housing situation.

In the status review report filed December 22, 2022, the social worker recommended the court offer mother an additional six months of services. The social worker had contacted mother on five occasions during the reporting period to ensure case plan compliance. The controlled substance testing service provider informed the social worker they could not forward the results of tests; it was up to mother to do so. Mother had provided the social worker documentation reflecting she had tested negative for controlled substances on two occasions.

A service provider sent a letter to the social worker reflecting that mother had an appointment for a medical evaluation; she was currently diagnosed for major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder, for which she was prescribed Lexapro.

Mother was still awaiting an opening for counseling. Thus, the social worker referred mother to a private service provider for counseling. Mother responded that she would continue to wait for an opening with the other service provider.

---

[6] It appears that the court had already authorized an ICPC for mother at the hearing on April 18, 2022.

11

Mother had twice weekly Zoom visits with minor. Mother frequently changed her visitation schedule. "[M]other spends 15 minutes with [minor], and then tends to go off the topic and speak with the caregiver regarding herself."

The social worker opined the "prognosis of the child returning home to the mother is fair. The mother is attempting to be compliant at this time. However, due to the mother being in a different state, the Department is unable to assess her current circumstance, including her housing. The Department has to wait for the ICPC to provide such. Further, [mother] has to enroll in counseling. The therapist may be able to provide an update on the mother's ability to provide appropriate and stable care for the child. At this time, the detriment of the risk to return the child home to the mother is rated is high." The ICPC as to the maternal aunt was awaiting the completion of a home study.

In an addendum report filed January 17, 2023, the social worker reported that mother had yet to begin counseling. Mother had not reported any additional drug testing. In December 2022, mother's ICPC was closed as mother was "in between homes" and had not responded in a timely manner; she told the social worker mother would inform her once mother had a permanent residence.

At the contested six-month review hearing on January 20, 2023, mother's counsel noted, "It's critical that we get the ICPC for mom, as well. That's the whole purpose of an ICPC when you have a parent out of state receiving services to assess their progress."

12

"And also mom with her ICPC, just ask the authorization to increase visitation if the ICPC is positive toward mother." The court continued mother's reunification services.

On March 28, 2023, the social worker filed the 12-month status review report in which she recommended the court terminate mother's reunification services and set the section 366.26 hearing due to mother's noncompliance with the case plan. According to mother, she had been seeing a psychiatrist for medication evaluations and had been participating in drug testing. However, mother had not provided the social worker any documentation to support her contentions.[7] She told the social worker that "father and the maternal aunt are in a romantic relationship and they are fabricating lies against her." Mother stated "that her sister has severe mental health issues and the Department should not he placing [minor] with her." Mother's ICPC assessment had been rescheduled for March 16, 2023.[8]

The social worker contacted mother four times since the last report. Mother said she was still on the waitlist for counseling. On March 15, 2016, mother provided information for a local therapist; the social worker completed a purchase authorization for services that day, which might take three weeks to be processed. Mother failed to provide any further drug test results for the reporting period. The social worker asked

_____

[7] On April 12, 2023, mother provided documentation of a negative drug test on January 13, 2023.

[8] No further information about the ICPC is included in the report despite it being filed 12 days after mother's scheduled assessment.

13

that mother sign a release of information so that the social worker could obtain documentation from the service providers directly.

Mother continued to have weekly Zoom visits with minor. Mother would spend 15 minutes with minor. Then she would speak with the caregiver regarding herself. "At this time, the mother is neither consistent nor punctual. The caregiver keeps on changing the visitation day/time to accommodate the mother's schedule."

At a hearing on April 12, 2023, mother's counsel argued "Mom is doing everything possible in Texas to show the Court that she is in a position to reunify with her daughter. It's been very difficult. The video Zoom visits are tough to build a relationship when you're 2,000 miles away." "[W]e need the ICPC results for mother, if there is an update if we can have that for our next court date, as well as the confirmation regarding the ICPC with the maternal aunt." The court set the matter for a contested hearing. The court asked "for an addendum for that date. I need the results or an update as to progress with the ICPC with mom, as well as with the maternal aunt."

In the addendum report, the social worker reported that the ICPC for the maternal aunt had been denied. The social worker was informed by an ICPC staff worker that there were no updates on the status of mother's ICPC.

Mother provided a negative drug test result from April 24, 2023. She told the social worker that "she is tired of submitting to drug testing." Mother provided no documentation for her assertion that she was participating in medical evaluations. On

14

May 16, 2023, mother's counsel filed documentation reflecting negative drug tests for January 13, and April 24, 2023.

At the 12-month hearing on May 16, 2023, the department noted that completion of the pending ICPC for mother was of utmost importance if the court was considering extending services because, without it, the department had no way to determine mother's current circumstances in Texas, particularly for the purpose of potential placement of minor with mother. Mother's counsel observed, "The real problem in this case is that we don't have the ICPC yet addressed in Texas for the mother so we can have someone in Texas having eyes on the mother reporting back to this Court. It's been extremely difficult I'm sure for the social worker and for Mother to really engage and explain what's happening in Texas when she's thousands of miles away." The court granted mother an additional six months of services.

On May 26, 2023, the social worker filed a request for a court order approving an updated case plan, which included, in addition to the previous plan, that mother sign a release of information. The court granted the request.

In the 18-month status review report filed July 19, 2023, the social worker continued to recommend the court terminate mother's reunification services and set the section 366.26 hearing. Mother continued to affirm that she was participating in medical evaluations and drug testing but failed to submit any documentation supporting her contentions.

Mother's second ICPC referral had been denied. ICPC staff reported "various concerns, such as, safety/lack of child proofing in the home, mental health issues, and lack of cooperation/hostility towards the Department." "Therefore, the Department is unable to assess [mother's] current circumstances, and [her] financial and non-financial resources to provide adequate care and supervision for the child."

Mother completed her intake for counseling on March 31, 2023. She had participated in five sessions since. The therapist recommended additional counseling sessions. He believed "that granting her custody would be in the best interests of" minor.

"The mother continues to have weekly Zoom visits with the child. The mother spends 15 minutes with the child; during which she is engaging with the child and interacts appropriately with the child. Then the mother tends to go off the topic and speak with the caregiver regarding herself. At this time, the mother is neither consistent nor punctual. The caregiver keeps on changing the visitation day/time to accommodate the mother's schedule. The mother has been authorized an additional visit. The mother has yet to confirm her additional visit."

On September 1, 2023, the social worker filed an addendum report in which she related that she had spoken with mother's therapist who requested additional sessions for mother. Mother had only provided two drug test results since moving to Texas, the last on April 24, 2023.[9] Mother's last documented medical evaluation occurred on April 13,

---

[9] Mother's counsel later submitted additional information including another letter from the therapist reflecting that mother had attended three more counseling sessions and a negative drug test dated July 25, 2023.

16

2023. The social worker had contacted the provider who would not relay any information as it was up to mother to do so.

"The mother spends 15 minutes with the child; during which she is engaging with the child and interacts appropriately with the child. Then the mother tends to go off the topic and speak with the caregiver regarding herself. At this time, the mother is neither consistent nor punctual. The caregiver keeps on changing the visitation day/time to accommodate the mother's schedule. The mother has been authorized an additional visit. The mother has yet to confirm her additional visit. On August 6, 2023, the mother allowed another female to participate in the visit. The caregiver asked the mother to refrain from allowing other people to join the visit, prior to the Department's authorization. The mother and the female became extremely [combative]. The caregiver had to terminate the visit."

Minor, who had been placed with her caregiver on March 1, 2022, was "doing well in her current placement. The child has been with the caregiver for over a year and has a strong bond with the caregiver that is reciprocated. The caregiver is providing consistently for [minor's] physical, emotional, developmental, medical, and recreational, needs. The caregiver is providing a safe and loving home environment to the child that is conducive to the child's wellbeing. [Minor] is thriving in the home."

The social worker testified at the contested 18-month hearing on September 19, 2023, that she did not conduct a virtual observation of mother's current residence "[b]ecause it was not required at that time because we were waiting for the ICPC to do

17

that first." Mother's case plan included "counseling, substance abuse testing, and psychotropic medication evaluation[s], and if she would test positive, then a substance abuse treatment program."

Mother had engaged in therapy which the therapist deemed as "generally positive." She had not completed counseling. The social worker made attempts to document mother's self-reported medical evaluations, but the provider would not release any information to her.

The social worker deemed mother compliant with her drug testing component. Mother declined to go to a drug testing provider set up through the department. The social worker did not know whether mother's drug tests "were random or on demand. Mom just chooses to drug test when she wants."

Mother missed some visits with minor. Mother only visited with minor for 15 minutes each visit. "Mom is not engaging. And another thing is mom sits in the dark.· That's what she said. The child cannot even see the mother at times. She sits in the dark. She talks for five, ten minutes, and then she talks about herself and random things." The department would not pay for mother to be transported to California for in-person visitation.

Mother "had two ICPCs. The first one was denied because of lack of contact. The second one she did contact, and it was denied based on the reason as stated in the addendum." "Mainly mom's mental health."

Mother testified she was living in a two-bedroom apartment and working. She had a room set up for minor.

"They also have set me up with someone who does psychiatrist altogether with the counselor. So I've been coping well with my anxiety with the therapist . . . as well as the psychiatrist together. They have basically shown me coping skills with my anxiety and stress, working well with other kids, as well as getting a better perspective of expectations of a parent and conflict and communication skills, a better way to handle those. And making sure that I'm okay with working well with other individuals and practicing how to handle a child." Mother saw her counselor once or twice weekly. Mother saw her psychiatrist once every three months.

Mother visited with minor by Zoom 32 to 33 times during the previous four months for 45 minutes to an hour each time. "I interact with her, sing her to sleep, try to play games, her interacting with me through the phone, like pity pat, clapping her hands, things like that." "I would interact like, you know, play little pity pat games, saying A, B, C's to her, 1, 2, 3. She will be sitting in her highchair eating."

Mother did not feel the social worker had assisted her in completing her case plan. She agreed to submit to further drug testing if the court granted her additional services but declined to complete a hair follicle test. The last time she drug tested was August 27.

Mother's therapist testified mother began seeing her on March 31, 2023; they see each other every other week for 50 to 60 minutes. "We talk about managing stress. We

talk about learning positive coping skills. We talk about negative self talk. And I do a lot of education as it relates to being a mother."

Mother's counsel argued that mother "has certainly engaged in services. And you heard mother testify. You heard the worker testify. And you heard her therapist testify." "She has been engaged in therapy. She's coping. She is working. She secured an apartment. She has a room for her child. It's extremely difficult, Your Honor. That is the reason why we wanted this child in Texas. You have mom testifying by Zoom. You have a therapist via Zoom. It's been difficult. It's never easy to do a trial where a client is 2,000 miles away in Houston, Texas." "But mother has persevered. She takes her medication. She sees her psychiatrist. She has the tools now to be an effective, nurturing parent to her child."

Mother's counsel argued the social worker had not provided reasonable services: "We're in the 21st century. The worker could have Face Timed or Skype to see my client's apartment where she is living. There could have been meetings with the therapist with my client to discuss issues via a Zoom conference call, whatever needed to be accomplished to ascertain that mother was addressing" the (b)(1) allegation.

The department argued, "at least in terms of the service rendered to this parent, there has been consistent assistance provided to her, notwithstanding the complications with a parent who resides out of state. [¶] It was, after all, the current social worker who assisted mother in providing resources to obtain a therapist, to have that therapist who's not contracted with the agency, set up for payment of therapy sessions, who has reached

20

out to the therapist to share information about the case . . . ."  "[I]t does appear that mom has engaged in counseling, but certainly not any clear evidence that she met the treatment goals, simply that she is improving on them in terms of her ability to cope."

The department noted that despite mother's testimony that she had been compliant with her medical evaluations, "We don't seem to be able to access that information directly from the provider.  We have not received mother's consent for that."  All the information they had was "funneled through [mother] and not through her medical providers, which we know can be difficult in terms of being able to verify updated and accurate information."

"With respect to the substance abuse testing, again, mother was initially referred to Texas Alcohol and Drug Testing Services, and this was a provider near her home.  However, she indicated she was going to test at the Harris Center for Mental Health.  And this was, again, a provider that was providing other services to her.  A consent was not signed."  The social worker had no control over directing mother to drug test at particular times.

"[T]he mother is essentially out of time.  The 18-month review would have run on August 12th, 2023."

Minor's counsel joined in the department's argument:  "Her visitation has not been consistent.  We do have a visitation log attached to the September 7th addendum report.  In June, there was eight visits scheduled.  Mom cancelled four of them.  Of the four she attended, one was—the shortest one was four minutes in duration, the longest was 52

21

minutes." "In July, there was six visits attended, two visits cancelled, and one visit terminated because mother was not engaged in the visit." "And then in August, it appears to have been two visits scheduled, one cancelled by mom and one terminated by the supervisor after mother brought in an adult female who was not authorized to be present for the visit. And mother and that adult female became combative and rude." "Letter from the therapist indicates she had only had eight therapy sessions. There is no release of information signed by mother, so the Department has been unable to confirm her compliance with her psychotropic medication."

"The only information that we can rely on that the Court has is that mother states she is taking her medication. We don't have any documentation of that, no refills. Initially mother testified she saw her psychiatrist last three months ago. And then she said a month ago in September. And then she said it was three months between appointments. Then she said her next appointment is October 12th or 13th. So even the information provided by mother today was not consistent."

"The Department was not able to obtain information as to how frequently she was tested, whether it was on demand, random, or whether they were scheduled in advanced by mom." "We have three [] tests, one from January this year, one from April this year, and one from July this year. We do not know if those are the only three tests or if there were more tests. We don't know if mother ever tested positive or refused to test. Mother testified her last [test] was last month. We don't have that result." "She also testified that she would not submit to a hair follicle. So there is really no way to confirm, again,

that she is not abusing or using controlled substances or even that she is taking her psychotropic medication as prescribed." "This minor has been in her placement approximately 18 months, and does not appear—no evidence that there is a bond with mom or mom is making any effort to form a bond with her daughter or make progress in services."

Mother's counsel replied, "It's [the social worker] who didn't make the effort to really assist my client. To put it all on my client is totally unfair because of her situation. [¶] She has made progress. She has engaged in services. The drug tests, that's a red herring. There are no allegations found true that she is abusing controlled substances."

The court noted that mother's therapist "didn't have the reports. He never spoke to mother's psychiatrist. He was not aware of any drug test results. Almost all this information came exclusively from mother, . . ."

The court continued, "We have mother who is choosing the testing site, despite the fact the Department provided information on a testing site. We don't know if those tests were random, if they were on demand or if they were scheduled by mother. We have mother choosing which result she is going to provide to the Department and not signing a release. We have mother indicating on the record today she is not willing to do a hair follicle test."

The court further found, "Mother's credibl[ity] is at issue here. We don't have— other than mother saying she is medication compliant, we have no information supporting that. We have no documentation. Mother has not provided any such information."

"[M]other's credibility is at issue for the reasons stated on the record throughout the testimony today, as well as what the Court has pointed out."

The court pointed out that although not required, two ICPC's as to mother had been denied. "We're past the [section] [366].22 date. I believe that ran in August sometime. And we are still trying to figure out whether or not she made any real progress towards her case plan, much less whether she made substantial progress or benefited."

The court found by clear and convincing evidence, that mother failed to participate regularly and make substantive progress in her court-ordered treatment plan and there was no substantial probability that the minor would be returned to her if given another six months of services. The court found it would be detrimental to return minor to mother, terminated mother's reunification services, and set the section 366.26 hearing.

## II.  DISCUSSION

Mother contends insufficient evidence supports the court's finding that the department offered mother reasonable services. Mother also appears to argue that the court erred in finding she failed to make substantive progress in her services. We disagree.

### A.  *Reasonable Services*

Mother contends the department failed to provide her reasonable services. We disagree.

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family.

24

[Citations.] Such services may, depending on the case, include evaluations and assessments, counseling, parent education, substance abuse treatment and testing, and other forms of assistance. ' "Reunification services," ' we have explained, ' "implement 'the law's strong preference for maintaining the family relationships if at all possible.' " ' [Citation.] This is because 'services enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.' [Citation.]" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 625, fn. omitted (*Michael G.*).)

"To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.] Reunification services should be tailored to the particular needs of the family. [Citation.]" (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)

" 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.]" (*In re A.G.*, *supra*, 12 Cal.App.5th at p. 1001.) "We review a reasonable services finding to determine if it is supported by substantial evidence. [Citation.] We consider the evidence in the light most favorable to the prevailing party and indulge in all

25

legitimate and reasonable inferences to uphold the court's ruling. [Citation.] The burden is on the petitioner to show that the evidence is insufficient to support the juvenile court's findings. [Citation.]" (*Ibid.*)

Here, substantial evidence supports the juvenile court's implied finding that the department offered mother reasonable services. First, prior to leaving California, the department offered mother resources for victims of crimes, drug testing, in-person visitation, parenting classes, medication evaluation, and individual counseling.

Second, it was mother who, prior to the jurisdictional hearing, chose to move to Texas, more than "2,000 miles away" from her daughter's foster care home. This obviously made it more difficult for the department to provide, and mother to participate in, reunification services, particularly meaningful visitation. Nevertheless, the department maintained consistent contact with mother and provided her reasonable services.

The department arranged twice weekly visitation via Zoom. In the interim, the department initiated ICPC's for mother, father, and the maternal aunt to potentially place minor with or near mother in Texas for the very purpose of permitting substantive visitation. Both mother's ICPC's were denied. Likewise, father and the maternal aunt's ICPC's were denied.

The department then initiated ICPC's for a maternal cousin and a non-related family member who both lived in Texas. However, by the time of the 18-month hearing, both ICPC's had either been closed or denied.

The social worker referred mother to a private counselor in Texas, which mother rejected despite having been placed on a waitlist by another provider for months. The social worker then requested mother contact another service provider for counseling, which was nearest mother's residence; she asked mother to sign a release of information so that the social worker could obtain information regarding mother's compliance with the case plan. Mother never executed the release of information, even when it became part of her case plan.

The social worker referred mother to Texas alcohol and drug testing services. The social worker referred mother to the Harris Center for Mental Health for medical evaluations. Thus, sufficient evidence supported the court's determination that the department had offered mother reasonable services.

Mother claims that since, she "was residing in Texas during the entire review period and the social worker was based in California, the effort put forth by the worker to assist the mother in reunification, was clearly lacking." Specifically, mother avers, "The social worker never conducted a virtual visit with mother at her residence during the review period, to see if her housing was suitable. The social worker never followed up with any housing authority to confirm mother's residence. The social worker never reached out to mother's employer about her work history."

However, the social worker testified that she did not conduct a virtual observation of mother's residence "[b]ecause it was not required at that time because we were waiting for the ICPC to do that first." No virtual visit was necessary because mother's second

27

ICPC referral had been denied due to "various concerns, such as, safety/lack of child proofing in the home, mental health issues, and lack of cooperation/hostility towards the Department." Even assuming a virtual visit would have resulted in a different conclusion, as discussed *post*, mother still failed to complete her case plan.

Moreover, neither the department nor the court expressed any concern about mother's work history when recommending or denying further reunification services. Indeed, unlike other aspects of her case plan, mother substantiated her work history with documentation.

B. *Detriment*

Mother appears to contend insufficient evidence supports the court's finding that it would be detrimental to "return" minor to her custody. We disagree.

"[T]he court is required to return the child to the parent's physical custody unless the Agency proves, by a preponderance of the evidence, that return would create a substantial risk of detriment to the child's physical or emotional well-being. [Citation.] We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation] 'The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental.' [Citation.]" (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483 (*Mary B.*).)

"To balance the interest in family preservation with the child's interest in the prompt resolution of her custody status and long-term placement, the dependency law

establishes a detailed timeline for reunification. For qualifying parents, the minimum length of reunification services depends on the age of the child at the time of removal. [Citation.] Parents of children under three are presumptively eligible for at least six months of reunification services. [Citation.]" (*Michael G.*, *supra*, 14 Cal.5th at p. 625, fn. omitted.)

"Reunification services are ordinarily provided for a maximum of 18 months after a child has been removed from parental custody. [Citations.]" (*Michael G.*, *supra*, 14 Cal.5th at p. 625.) "'[I]n order to prevent children from spending their lives in the uncertainty of foster care, there must be a limitation on the length of time a child has to wait for a parent to become adequate.' [Citation.] If the child has already been out of the parent's custody for 18 months and still cannot be safely returned, the statute instructs that the court ordinarily must proceed to schedule a permanency planning hearing under section 366.26, at which the court decides whether to terminate parental rights and place the child for adoption or else select another permanent plan. [Citation.]" (*Id.* at p. 627.) "[O]nce a child has been out of a parent's custody for 18 months, the court must proceed to set a hearing to select a permanent plan for the child." (*Id*. at 628 [Except in certain narrow circumstances such as when the parent was a dependent child, was in a court ordered drug treatment program, or was in prison during the proceedings.].)

Here, substantial evidence supports the court's finding that mother failed to make substantive progress in her case plan. We note at the outset that mother does not come within one of three categories that would even permit the court to grant her services

beyond the 18-month mark. (*Michael G.*, *supra*, 14 Cal.5th at p. 631.) Moreover, the only portion of the case plan that mother completed was the parenting component.

The court's dispositional order required drug testing as a component of mother's case plan, but over the course of 14 months mother had provided documentation of only five negative drug tests. As supported by the social worker's testimony, the court found that it was not clear whether the tests were randomized or only occurred when mother felt like testing. The department had no information if mother ever tested positive or refused to test. The service provider would not forward the results of the tests because mother had declined to sign a release of information even though it was part of her case plan. Mother said she was tired of submitting to drug testing. The court observed that during her testimony, mother refused to submit to a hair follicle test.

There were consistent complaints about the duration and substance of mother's Zoom visits with minor. Mother was inconsistent with visitation, was not punctual, and would not spend more than 15 minutes interacting with minor. Mother never proceeded to unsupervised visitation.

Mother had not completed counseling. Mother's therapist indicated they had only engaged in eight therapy sessions. Mother failed to provide any documentation that she had been compliant with the medical evaluation component of her case plan. Mother notes that she testified under oath that she had been taking her medication; however, the court expressly found mother's testimony not credible. We cannot reevaluate the court's credibility determination. (*In re Mary B.*, *supra,* 218 Cal.App.4th at 1480 ["[I]t is the

30

duty of the juvenile court to weigh the evidence and consider the credibility of witnesses . . . ."].)

As he did below, mother's counsel implies that drug testing should not have even been part of mother's case plan because "the abuse of controlled substances was not even an allegation in the juvenile court petition amended and filed with the court."[10] First, contrary to counsel's assertion, the department did allege abuse of controlled substances in both the initial and amended petitions. Second, although the court struck that allegation, the juvenile court is not limited to ordering services directed at ameliorating the specific allegations in the petition that it sustained. Instead, the court has broad discretion when fashioning dispositional orders necessary to promote the child's welfare. (*In re K.T.* (2020) 49 Cal.App.5th 20, 25 [drug testing a reasonable requirement for reunification services even where the court did not sustain any allegations regarding drug use as to that parent].) Third, a drug testing component for mother's case plan was well supported by the information that mother had her previous child removed from her, at least in part, due to abuse of controlled substances, and mother's own admission to having previously abused controlled substances.

Ultimately, mother was out of time. More than 18 months had passed since minor had been removed from mother's custody; minor was less than two months old when the

---

**10** Mother's counsel also complained below that the parties would "demonize" mother by referring to her as an "offending parent." An offending parent is definitionally any parent who "is in some way responsible for the events or conditions that currently bring the child within section 300. . . ." (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1505.) Thus, mother was definitionally an "offending parent."

court detained her.  The court's finding of detriment and termination of mother's reunification services was supported by substantial evidence.

## III.  DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

MENETREZ
J.