Filed 11/6/25  In re E.L. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.L., a Person Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                    v.<br><br>M.L.,<br><br>        Defendant;<br><br>J.P.,<br><br>        Objector and Appellant. | F089675<br><br>(Super. Ct. No. JJV075481A)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tulare County.  Sara Bratsch, Judge.

Sarah Vaona, under appointment by the Court of Appeal, for Objector and Appellant.

Jennifer M. Flores, County Counsel, John A. Rozum and Marit Erickson, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

J.P. ("father"), the father of female minor E.L., appeals from the juvenile court's order denying his Welfare and Institutions Code[1] section 388 modification petition seeking sole custody of E.L. and termination of the court's jurisdiction. He contends the court should have evaluated his petition under section 361.2, subdivision (a), which governs placement of a child who has been removed from a custodial parent and requires placement with the noncustodial parent unless such placement would be detrimental to the child. We reject the contention and affirm.

## BACKGROUND

E.L. was born prematurely in January 2024,[2] and placed in the neonatal intensive care unit. On January 29, while E.L. remained hospitalized, a referral was made to the Tulare County Health and Human Services Agency ("Agency") due to concerns about M.L.'s ("mother") inability to care for E.L. because of untreated mental health issues. Mother was visiting E.L. four times a week but was observed falling asleep during visits and handling E.L. in an unsafe manner.

Social workers contacted mother at her home on January 31. On that date, mother still did not know who E.L.'s father was. She reported living with E.L.'s maternal grandmother, but the grandmother reported that mother lives alone. Mother said she experienced postpartum depression with all four of her children and takes psychotropic medication. She disclosed having been diagnosed with anxiety and depression. During the visit with social workers, she displayed a flat affect and appeared disoriented.

Mother's other three children lived with their father (not J.P.), who has full custody of all three. The father filed for an emergency protective order in 2022 after mother was placed on an involuntary psychiatric hold.

---

g[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Subsequent references to dates are to dates in 2024 unless otherwise stated.

2.

The juvenile court issued a protective custody warrant on February 2, removing E.L. from mother's custody. Three days later, the Agency filed a petition under section 300, subdivision (b)(1), alleging mother's mental illness rendered her unable to care for E.L., which placed E.L. at substantial risk of harm.

The court held a detention hearing on February 6. Father was identified, by first name only, as E.L.'s father. The court found that a prima face showing had been made that E.L. is a person described by section 300 and ordered her "detained from Mother." The court ordered visitation for mother with E.L.

E.L. was placed with a maternal great aunt when she was released from the hospital on March 11.

By March 2024, the Agency had identified and contacted father. Father told the social worker that he had been intimate with mother but did not know whether he was E.L.'s father. He said he was going to request a paternity test at the combined jurisdiction and disposition hearing. He claimed not knowing mother was pregnant until after E.L. was born. Father lives in Georgia but met mother while working in Fresno from April 2023 to October 2023. They became friends after meeting at the gym and developed a romantic relationship.

Father told the Agency that if E.L. is his child, he would "prefer" that she be in his care, "especially if mom can't take care of her." He said he communicated with mother by phone about E.L.

After a combined jurisdiction and disposition hearing on March 28, the court sustained the section 300 petition, ordered paternity testing, and set a further hearing on disposition. In May 2024, the Agency submitted paternity test results showing a 99.99 percent probability that father was E.L.'s biological parent. Father told the agency he wanted "to take an active parenting role" and requested his paternity status be elevated from biological to presumed. E.L. was still living with her maternal great aunt.

A May 2024 Agency report stated that father was married and lived with his wife and their one child in Georgia. Father began Facetime visits with E.L. four days a week for fifteen minutes at a time, beginning May 2. E.L.'s maternal great aunt supervised the visits and reported that father appeared very loving towards E.L. Father traveled to Tulare in mid-April and visited E.L. on each of the three days he was there. The visits went well, with father attending to E.L.'s needs and acting lovingly towards her.

Ahead of the disposition hearing, the Agency recommended that mother receive six months of Family Reunification Services, with discretion to the Agency to return E.L. to mother's care under Family Maintenance Services before the review hearing. The Agency further recommended that father's paternity status be elevated from alleged to biological.

At the disposition hearing on May 23, the court elevated father's paternity status to biological father. It also ordered E.L. removed from mother's custody, and it vested in the Agency the responsibility for E.L.'s placement and care. The court ordered six months of reunification services to mother and supervised visitation for both parents.

In August 2024, E.L.'s attorney agreed to father having unsupervised visits with E.L. Those visits went well, and in September 2024 the Agency approved father for overnight visits with E.L. In November 2024, the Agency approved mother for unsupervised visits with E.L. The Agency also reported that mother was complying with her case plan, had safe housing for E.L., and was attending parenting classes. The Agency thus requested discretion to allow mother overnight visits. After a November 14 review hearing, the court found that both parents had made "substantial progress" towards alleviating the causes necessitating E.L.'s placement in foster care.

On December 12, the court elevated father's paternity status to presumed father and made an interim custody order: father was to have placement of E.L. "on Family Maintenance" from December 12 until January 10, 2025, and then mother was to have placement "on Family Maintenance" until February 6, 2025. The parent who did not

4.

have custody was to have video visitation four times a week. The court also ordered Family Maintenance services for both parents to begin that day. Also on December 12, mother completed her SafeCare Parenting program. The Agency reported mother was complying with her mental health treatment plan.

On January 10, 2025, father filed a section 388 request to change the December 12 shared custody and visitation order. He requested that the court grant him sole legal and physical custody of E.L. and terminate its jurisdiction over E.L. He submitted two declarations of his own and a declaration from his wife in support of his request.

In his first declaration, father asserted that mother was unable to safely care for E.L. He said that since mother has had E.L. in her care, mother has "cut off" father's court-ordered video visits. Mother was late to or missed nearly every scheduled video call. She also had E.L. vaccinated despite father telling her that he already had her vaccinated. He reported that mother mocked him on phone calls that the social worker was on "her side," and he asserted that the social worker actually was on mother's side, as the social worker had shown a "true lack of objectivity."

A hearing on father's section 388 request was set for February 6, 2025, the same date already set for a review hearing. The Agency filed an interim report ahead of the hearing which stated that mother and father had difficulty communicating and scheduling video visits for each other. The Agency wanted the parents to continue receiving Family Maintenance services and working on their communication with each other. It also recommended that the parents continue sharing custody of E.L., with each having E.L. for a month at a time with video visits for the noncustodial parent. As to father's section 388 request, the Agency stated that both parents are learning to coparent and that it would not be in E.L.'s best interest to grant father sole custody because E.L. was bonded to both parents.

The section 388 request was continued once to March 6, 2025, and then again to April 2, 2025. At the March 6, 2025, hearing, father was ordered to return E.L. to mother on March 10, and mother was to have placement of E.L. until the April 2, 2025 hearing.

At the April 2, 2025 hearing, father's counsel clarified father's section 388 request. Counsel asserted that once father's paternity status was elevated to presumed, the court "should have exercised its discretion under section 361.2 and dismissed dependency because a presumed parent has a constitutional right to parentage." Counsel later clarified father's position: when father was elevated to presumed father, since the court had not ever made a finding that it would be detrimental to place E.L. with father, the court should have granted father full custody and terminated its jurisdiction over the matter under section 361.2.

The Agency asserted that only presumed fathers can request custody under section 361.2, and by the time father attained presumed status he already had shared custody of E.L. Section 361.2 thus did not apply to him., the Agency argued. The court agreed with the Agency that section 361.2 did not apply, but it allowed father to present evidence on other grounds as to why the court should grant him sole custody and terminate its jurisdiction.

Father testified that E.L. was thriving in his care in Georgia, beginning in December 2024. Her energy and personality "blossom[ed]." Communicating with mother was challenging; they had been struggling to establish courtesy in their communications. After returning E.L. to mother in January 2025, many times he was unable to have his court-ordered video visits because mother would not answer her phone or return his calls. Father also recounted how he learned that E.L. had been double vaccinated.

The court heard argument from the parties after father's testimony. Father argued it was not in E.L.'s best interest to have a relationship with mother. He said the problem was not "coparenting," but rather mother's inability to provide for E.L.'s needs. E.L.'s

attorney claimed that granting father sole custody would be "extremely detrimental" to E.L. "because she loves her mother, and she also loves her father." E.L.'s counsel also asserted that there had not been a change in circumstances to support granting a section 388 request. The Agency argued that mother had completed all of her services, that she and father are both doing the "best they can" for E.L., that father had not shown a change in circumstances, and that it is in E.L.'s best interest to have both her parents in her life. Mother also argued that granting father's request would not be in E.L.'s best interests and that father had not shown a change in circumstances. She asserted that she had completed her services, had cared for E.L. for about the same amount of time as father, there had not been any new detentions, and E.L. deserved to have both her parents in her life.

In denying father's request, the court stated it was considering father's testimony, the declarations and recommendations it had received, and argument from the parties. The court found that father had not shown a change in circumstances to justify removing E.L. from mother's care, granting sole custody to father, and terminating its jurisdiction. The court also found this would not be in E.L.'s best interests. The court stated, "The progression of this case has gone very well for mother." The court noted that mother had "engaged in her services" and stated that it "does agree wholeheartedly that [E.L.] needs both parents." Although the parents have experienced a "significant breakdown in communication and coparenting," the court did not cast blame on either parent. Instead, the court ascribed the problem to the parents' "strong difficulty in deciding what is in the best interest of [E.L.]." To that point, the court found that both parents are "coparenting and working in the best interest of [E.L.]" and commended the parents for "working and trying baby steps to get to the place where they can coparent in the best interest of the child." The court concluded that it is in E.L.'s best interests to have both parents in her life and that E.L. would be "significantly affect[ed]" if she lost her relationship with her mother. The court thus stated that it would not make "such a severe order at this time."

## DISCUSSION

Father claims the juvenile court abused its discretion in denying his section 388 request to modify the December 12, 2024, shared custody and visitation order. Specifically, he argues the court should have removed E.L. from mother's care, granted him sole custody, and terminated its jurisdiction. He asserts the court was required to do so under section 361.2. However, in our view, section 361.2 did not apply here. Instead, the normal section 388 framework governed, and the court did not abuse its discretion in finding no changed circumstances and determining that it was not in E.L.'s best interests to grant father's request.

In general, a section 388 petition to modify a prior juvenile court order requires the petitioner to show, by a preponderance of the evidence, both (1) a change in circumstances or new evidence, and (2) that the requested order is in the child's best interests. (§ 388, subd. (a)(1); *In re J.M.* (2020) 50 Cal.App.5th 833, 845.)

The issue here involves the interplay between section 388 and 361.2; section 361.2 applies at disposition. After a juvenile court assumes jurisdiction over a child under section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169.) If, at the dispositional hearing, the court removes the child from the care of the custodial parent under section 361, section 361.2 requires it to place the child with the noncustodial parent unless doing so would be detrimental to the child.[3] (§ 361.2, subd. (a).) The statute further provides several options if the child is so placed, including termination of

---

[3] Section 361.2, subdivision (a) provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

jurisdiction.  (*Id.*, subds. (b) & (c).)  The detriment finding must be made by clear and convincing evidence.  (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.)

By its terms, section 361.2 generally applies only at the disposition stage, after the court removes the child from a custodial parent.  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 453.)  To qualify as a noncustodial parent for these purposes, an alleged or biological father must also attain presumed-father status.  (*Id.* at p. 454.; *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1080, fn. 5 (*Liam L.*).)  That said, several courts have applied section 361.2 to noncustodial parents' requests for custody made after disposition.  (*Liam L.*, at p. 1073, 1085; see also *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1255–1256 (*Jonathan P.*); *In re Suhey G.* (2013) 221 Cal.App.4th 732, 744–745.)

Father relies on *Liam L.*, which involved a noncustodial father's postdisposition section 388 petition seeking placement of the child.  (*Liam L., supra,* 240 Cal.App.4th 1068, 1083.)  The appellate court there explained that after a disposition order, a noncustodial parent may seek a change in placement through a section 388 petition.  (*Id.* at pp. 1083–1084.)  For example, if a noncustodial parent has only recently become involved in the dependency case and developed a relationship with the child, he or she may allege changed circumstances or new facts supporting placement with them.  (*Id.* at p. 1084.)  In such cases, the general two-part section 388 test does not strictly apply.  (*Id.* at pp. 1073–1074, 1085–1086.)  Because California's dependency scheme presumes placement with a noncustodial parent absent a finding of detriment, such placement is presumed to be in the child's best interests.  (*Id.* at p. 1073, fn. omitted.)  Accordingly, a noncustodial parent makes a prima facie showing of best interests under section 388 when requesting custody postdisposition; the child must be placed with that parent unless the opposing party establishes detriment to the child's safety or well-being.  (*Id.* at pp. 1085–1086.)

Father applies this section 361.2 framework to argue both changed circumstances and best interests.  He contends his elevation to presumed-father status constituted the

required change in circumstances, since only a presumed father may seek placement under section 361.2. As to best interests, he argues that because the court never found that placement with him would be detrimental, it was obligated to grant him custody and terminate jurisdiction. He thus claims the court abused its discretion by finding neither changed circumstances nor best interests sufficient to support his petition.

Whether section 361.2 applies to a noncustodial parent's custody request is a question of law we review independently. (See *Jonathan P., supra,* 226 Cal.App.4th at p. 1252.)

*Liam L.* does not hold, and no case we have found holds, that section 361.2 applies to a *custodial* parent's request for placement by means of a section 388 petition. When father filed his section 388 petition in January 2025, he and mother already shared custody of E.L. Although E.L. was initially removed from mother's care in February 2024, by January 2025 E.L. was living with both parents on a rotating basis. Because father was a custodial parent when he filed his petition, section 361.2 did not govern the court's determination of his petition. Most significantly, that means the court was not required to grant father sole custody absent a showing of detriment. Instead, the ordinary section 388 standard applied: father bore the burden of showing that granting his request was in E.L.'s best interests.

The determination of a section 388 petition is reviewed for abuse of discretion. (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 382.) "We must uphold the juvenile court's denial of appellant's section 388 petition unless we can determine from the record that its decisions ' "exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505). " 'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' " (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.)

10.

We conclude the court did not abuse its discretion in determining that father's request for sole custody was not in E.L.'s best interests.  The Agency reported that E.L. was bonded to both parents and opined that severing her relationship with mother would not serve her interests.  Mother had also engaged in her reunification services, and no new grounds for removal from mother's care arose after E.L. was returned to her care.  Father argues that it is "not sustainable" for E.L. to continue traveling between California and Georgia and points to his and mother's communication problems and mother's decision to revaccinate E.L.  The court heard these concerns and determined they did not justify the "severe" step of granting father sole custody.  On this record—showing that E.L. was bonded to both parents and that mother had made sustained progress—the court's conclusion was well within the bounds of reason.  Because the court did not err in denying father sole custody, it necessarily did not err in declining to terminate jurisdiction.

### DISPOSITION

The trial court's April 2, 2025, order denying father's section 388 petition is affirmed.

SNAUFFER, J.

WE CONCUR:

HILL, P. J.

GUERRA, J.*

---

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11.